ALWIN MANUFACTURING
CO., INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

United Steelworkers of America,
AFL–CIO/CLC, Intervenor.

No. 98–1432.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1999.

Decided Sept. 28, 1999.

See also: 78 F.3d 1159.

John R. Cernelich argued the cause for petitioner. With him on the briefs was Scott M. Loomis. William E. Coughlin entered an appearance for petitioner.

Rachel I. Gartner, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret A. Gaines, Supervisory Attorney.

Craig Becker argued the cause for intervenor. With him on the brief were Carl B. Frankel, Daniel M. Kovalik, Larry Engelstein and James B. Coppess.

Before: WALD, SILBERMAN and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Alwin Manufacturing Co., Inc. ("Alwin" or "the company") unilaterally instituted minimum production standards and changed its vacation scheduling policy during the pendency of a collective bargaining agreement it had with the United Steelworkers of America, AFL–CIO/CLC ("the union"). The National Labor Relations Board ("the Board") found Alwin's unilateral actions to be unfair labor practices under the National Labor Relations Act ("the Act"). The Board's decision, however, did not issue until after the applicable collective bargaining agreement ("CBA") had expired. Before the Board's decision issued, Alwin and the union engaged in extensive but ultimately unsuccessful negotiations over a new CBA. At the expiration of the CBA, the union went on strike, and Alwin implemented the terms of its final offer as the conditions of employment at its plant. The Board found in a second proceeding that Alwin violated the Act by unilaterally implementing its final offer, and by treating the striking workers as economic strikers, rather than unfair labor practice strikers.

The primary question in this case is whether the Board properly concluded that the existence of the original unfair labor practices causally contributed to the parties' inability to reach a new collective bargaining agreement. In addition, we must consider whether there is substantial evidence in the record to support the Board's conclusion that the workers were engaged in an unfair labor practice strike, and whether Alwin sufficiently brought to the attention of the Board its objections to the remedy proposed by the Administrative Law Judge ("ALJ"), which is a prerequisite to judicial review under section 10(e) of the Act.

We hold that the Board's findings and conclusions are supported by substantial evidence on the record, and that the company did not properly take an exception to the remedy proposed by the ALJ. Accordingly, we deny Alwin's petition for review and grant the Board's cross-application for enforcement of its order.

## I. BACKGROUND

Alwin is a closely-held corporation located in Green Bay, Wisconsin that manufactures metal dispensers for paper towels, tissues, and napkins. The United Steelworkers of America has represented Alwin's employees since the early 1960s; the bargaining unit consists of approximately 123 employees. Alwin and the union were parties to a series of collective bargaining agreements, one of which covered the period from March 1, 1991 through February 28, 1994.

In June 1992, management informed the union that it wished to alter the vacation scheduling policy. Following some discussion, but without the union's agreement, Alwin implemented a new policy in which vacation requested more than three weeks in advance would be scheduled according to "first come, first served," rather than according to seniority.[1]

On September 21, 1992, management informed the union that, as of the following day, certain jobs would be subject to minimum production standards. On September 23, 1992, Alwin began disciplining workers for failing to meet the standards.

Shortly thereafter, the union filed unfair labor practice ("ULP") charges with the Board, alleging that the unilateral implementation of these policies violated sections 8(a)(1) and (5) of the Act. An ALJ heard the case in Spring 1993 and issued a decision on April 27, 1994, finding that Alwin had committed ULPs. The Board affirmed the ALJ's decision and adopted his proposed order on July 28, 1994. *Al-*

---

1. In addition, the company would set a maximum of people who could take vacation on any given day, and employees would only be eligible to schedule on the "first come, first

served" basis if they had already made a financial commitment to the vacation when they requested the time off.

*win Mfg. Co.,* 314 N.L.R.B. 564 (1994) (*Alwin I*), *enforced,* 78 F.3d 1159 (7th Cir. 1996). The company resisted complying with the order and the Board petitioned the Seventh Circuit for enforcement. The court of appeals found that Alwin's arguments against enforcement were frivolous and enforced the order. *NLRB v. Alwin Mfg. Co.,* 78 F.3d 1159, 1163 (7th Cir. 1996).[2]

As of Fall 1993, there had been a hearing on the ULP charges but no decision, and Alwin continued to implement the new vacation policies and production standards. The CBA was scheduled to expire on February 28, 1994. In December 1993, the parties began to negotiate over a new CBA. There were fourteen sessions held, with the final one occurring on February 28, 1994.

The parties were far apart on a host of issues, including the scope of the management rights clause, changes in vacation policy, use of temporary workers, and wage and benefit concessions. However, the company's insistence on the retention of its unilaterally adopted production standards was one of the primary issues on which the parties disagreed. Alwin had implemented hourly quotas for different jobs in the plant, and failure to meet those quotas resulted in warnings, temporary layoffs, and ultimately discharge.[3] The company consistently took the position throughout the pre-strike negotiations that, although the process by which new standards would be adopted might be negotiable, the standards which were already in place were "proven" and not subject to negotiation or challenge by the union.[4]

On February 28, 1994, Alwin gave the union its final offer. In that offer, the production standards in effect as of March 1, 1994, would not be subject to challenge or grievance. However, production standards instituted after that day could be challenged and taken to an arbitrator. The offer also contained a $3 per hour pay cut and other changes which, from the perspective of the union, were detrimental. At that meeting, the company also indicated it would rescind all discipline, including discharge, for failure to comply with the performance standards prior to March 1, 1994.

The union representative indicated that he thought this offer would not be acceptable to the members of the union. The company's representative declared that they were at an impasse, and that the company would implement its final proposal the following day. The union held a meeting that same day so its members could consider the company's proposal. The union's chief negotiator went through the company's final proposal with the union members. Among the issues he highlighted was the fact that, if the workers accepted this offer, they would never be able to challenge the production standards already in place, which had been responsible for dozens of grievances and seven discharges.

Following a discussion, the union voted 115–2 to reject the offer and go on strike as of March 1, 1994. The first day of the strike, Alwin's president sent all striking employees a letter urging them not to strike, and advising them that if they did strike they were subject to permanent replacement, with only a preference for fu-

---

2. The Seventh Circuit also noted that the ULP charges should not have been a surprise to Alwin, since "[f]ew topics are more central to the relationship between an employer and its union-represented employees than vacation policy and performance expectations." 78 F.3d at 1160. The court of appeals subsequently awarded the Board double costs pursuant to Rule 38 of the Federal Rules of Appellate Procedure.

3. There was testimony before the ALJ that by February 28, 1994, there were 60–70 grievances pending on production standards and seven employees had been discharged for failure to meet the standards.

4. The company maintained this position consistently until August 26, 1994, over five months into the strike and a month after the Board issued its decision in *Alwin I.*

ture hiring. Six weeks into the strike, Alwin sent letters to each of the striking workers who had been discharged for failure to meet production standards, offering them $10,000 in exchange for a release of all claims they might have against the company. Three of the workers accepted the offer.

On April 27, 1994, the ALJ issued his opinion in *Alwin I*, finding that the unilateral institution of production standards and changes in vacation policy were unfair labor practices. Around May 4, 1994, the company indicated that it was not willing to compromise on any issues. On July 28, 1994, the Board adopted the ALJ's findings and proposed order requiring Alwin, *inter alia*, to rescind the production standards and discipline issued under them. Alwin took no steps to comply with the remedial order.

On August 26, 1994, the parties met for a negotiation session, which was also attended by a federal mediator. The company initially rejected a proposal to allow the union to challenge the production standards that were in effect as of March 1, 1994, and insisted it would not change the production standard policies it had implemented. The company then indicated that it would allow the union to perform a time-study of the standards (based on the replacement workers), and arbitrate their fairness. The company made no suggestion that it had done or would do anything to comply with the Board's remedial order.

On October 27, 1994, the striking workers made an unconditional offer to return. Alwin indicated that it would recall strikers as openings occurred, in order of seniority. Two senior workers were recalled, and then disciplined for failure to meet production standards, with one being discharged and the other receiving a discharge caution. The ALJ found that there was evidence of discrimination against the returning strikers, including giving them the worst work and encouraging replacement workers to work harder so the company could recall fewer strikers.

In a second proceeding, the Board found that the unremedied ULPs, *i.e.*, the unilateral implementation of performance standards and the new vacation policy, contributed to the parties' failure to reach an agreement. *Alwin Mfg. Co.*, 326 N.L.R.B. No. 63 (August 27, 1998) (*Alwin II*). As a result, the Board concluded that the parties did not reach a good-faith impasse, and Alwin was not entitled to unilaterally impose its final offer. The Board also concluded that the employees' strike was an unfair labor practice strike, and that the company had committed additional violations of the Act, in treating the workers as economic strikers subject to permanent replacement and in bypassing the union to deal directly with employees. Finally, the Board found that the company had engaged in bad-faith conduct in negotiations with the union and in the agency proceeding. Thus, the Board ordered the company not only to pay make-whole damages to the workers, but also to pay the union's costs of negotiating, striking, and litigating these issues, as well as the General Counsel's litigation costs.

## II. DISCUSSION

### A. *The Board's Conclusions that Alwin Violated the Act*

 Section 8(a)(5) of the Act makes it an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). It is a violation of section 8(a)(5) for an employer to make changes in terms and conditions of employment without either reaching an agreement with the union or bargaining in good faith until impasse is reached. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *Daily News v. NLRB*, 73 F.3d 406, 410–11 (D.C.Cir.1996). In this case, there is no question that the changes in vacation policy and production standards unilaterally

instituted during the prior collective bargaining agreement were unfair labor practices. The central question is whether the existence of those unfair labor practices had a negative impact on the negotiations over a new CBA that contributed to the deadlock. If not, then Alwin may have been entitled to implement its final offer at the end of negotiations. *See American Fed'n of Television & Radio Artists v. NLRB,* 395 F.2d 622, 624 (D.C.Cir.1968) (where parties reach good-faith impasse, employer entitled to unilaterally institute terms reasonably comprehended within its pre-impasse proposals); *see also NLRB v. Cauthorne,* 691 F.2d 1023, 1025–26 (D.C.Cir.1982) (no presumption that existence of ULPs prevents the parties from reaching a valid impasse). On the other hand, if the existence of the unremedied ULPs did contribute to the lack of an agreement, then there was no good-faith impasse. *Intermountain Rural Elec. Ass'n v. NLRB,* 984 F.2d 1562, 1569–70 (10th Cir.1993); *J.D. Lunsford Plumbing,* 254 N.L.R.B. 1360, 1366 (1981), *enforced without opinion sub nom. Sheet Metal Workers, Local 9 v. NLRB,* 684 F.2d 1033 (D.C.Cir.1982); *see also Wayne's Dairy,* 223 N.L.R.B. 260, 265 (1976) ("A party cannot parlay an impasse resulting from its own misconduct into a license to make unilateral changes.").[5] If there was no good-faith impasse, Alwin was not entitled to make any changes in the terms of employment, even after the prior CBA had expired. *See Litton,* 501 U.S. at 198, 111 S.Ct. 2215; *Cauthorne,* 691 F.2d at 1025.

Alwin's primary contention is that the Board did not consider whether the ULPs *contributed* to the deadlock, but rather that the Board applied a *per se* rule that the existence of the ULPs necessarily meant that good-faith bargaining could not occur. This argument, however, is entirely belied by the record. The Board specifically cited the ALJ's finding that "the

Respondent's insistence on maintaining these unlawful employment terms through the entire negotiating process resulted in continued friction and disagreement at the bargaining table and *ultimately was responsible, in material part, for the breakdown in negotiations." Alwin II,* slip opinion ("slip op.") at 3 (emphasis added); *see also id.* at 44 (ALJ's analysis and conclusions) ("Since the breakdown in negotiations, in material part, was a proximate result of the Respondent's unyielding adherence to its unremedied unfair labor practices, I find that the Respondent was not entitled to declare impasse . . . .").

Alwin points to one sentence in the Board's opinion and one sentence in the ALJ's opinion to confirm its view that a *per se* rule was applied in this case. We find that neither of the sentences suffices to establish that the Board used a *per se* rule.

Near the beginning of its decision, the Board stated that it was adopting the ALJ's finding that Alwin was not entitled to implement its final contract proposal, adding "[i]n so doing, we rely on the first rationale set forth in the judge's decision; i.e., no valid impasse had been reached . . . because [Alwin] had not remedied its prior unfair labor practices." *Alwin II,* slip op. at 1. The Board then went on to state that it was not relying on the ALJ's alternative ground for finding violations of the Act, namely that Alwin engaged in surface bargaining. *Id.*

As already noted, the ALJ explicitly found, on the basis of the factual record in the case, a causal connection between the unilateral changes and the failure to reach an agreement. Had the Board said nothing more on the subject, we might worry whether the Board's unfortunately abbreviated description of the ALJ's rationale does suggest a kind of *per se* rule.

---

**5.** Although a valid impasse is described as a good-faith impasse, in this context the question is not only the subjective good faith of the parties, but also whether the employer's uni-

lateral actions harmed the negotiations, regardless of its subjective good faith. *See Katz,* 369 U.S. at 747, 82 S.Ct. 1107; *Intermountain,* 984 F.2d at 1570.

However, that is not this case, for the ALJ himself did not apply a *per se* rule, and other parts of the Board's opinion, *i.e.*, its description of the ALJ's finding that "insistence on maintaining the unlawfully implemented employment terms ... was responsible, in material part, for the breakdown in negotiations," *id.* at 3, show that the Board understood that the ALJ's analysis rested securely on a finding that the ULPs contributed to the deadlock. Read in the context of the full opinion then, the Board merely seems to be using a shorthand description of the ALJ's invalid impasse rationale upfront to distinguish it from the ALJ's alternative, and rejected, surface bargaining rationale.

Alwin's other indication in support of a *per se* rule is the ALJ's statement that "until remedied, [the establishment of production standards and changes to vacation policy] cannot serve as valid grounds for deadlock during contract negotiations." *Alwin II*, slip op. at 45. It appears that the ALJ made this statement in the course of finding that Alwin engaged in surface bargaining. Since the Board declined to adopt the ALJ's finding of surface bargaining, and explicitly cited the separate finding of the ALJ that the existence of the ULPs "was responsible, in material part, for the breakdown in negotiations," this language is not in the end evidence that the Board applied a *per se* rule at all.

Alwin makes a secondary argument that the Board erred in finding that the existence of the ULPs contributed to the lack of an agreement. The Board's factual findings are conclusive in this court if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We find that the Board's conclusion that the unremedied ULPs contributed to the parties' inability to reach an agreement is supported by substantial evidence in the record.

It may not always be easy to distinguish between an unremedied ULP which con-

tributes to deadlock and one that does not. This is a quintessential question of fact which is appropriately left to the Board to resolve in each case in light of its expertise. *See American Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622, 627 (D.C.Cir.1968) ("In the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of [the Board].") (quoting *Dallas Gen'l Drivers v. NLRB*, 355 F.2d 842, 844–45 (D.C.Cir. 1966)). There is certainly evidence in this record, however, to support the Board's conclusion in this case.

There are at least two ways in which an unremedied ULP can contribute to the parties' inability to reach an agreement. First, a ULP can increase friction at the bargaining table. Second, by changing the status quo, a unilateral change may move the baseline for negotiations and alter the parties' expectations about what they can achieve, making it harder for the parties to come to an agreement. Evidence that both of these things occurred is ample in this record.

The record evidence supports the ALJ's finding that the ULPs increased friction at the bargaining table, which in turn contributed to the parties' deadlock. At one point, the union representative told management that the unilateral changes were reducing the trust between the parties, and that it looked to the union as though the company would do whatever it wanted, regardless of the parties' agreement. *See Alwin II*, slip op. at 24; Joint Appendix ("J.A.") at 1619–20. At another point, the union representative stated he was willing to work on productivity standards, but the company was "shafting" its employees. *Alwin II*, slip op. at 22. There was testimony that there were 60–70 grievances pending, and seven discharges, as a result of employees' inability to meet the performance standards. The existence of a large number of grievances attributable to a ULP could be expected to contribute to

the friction at the bargaining table. *See also id.* at 19 (management representative suggested that employee who was discharged for failure to meet production standards had not wanted to meet standards).[6]

Apart from the question of friction, however, there is also evidence in the record that Alwin attempted to use the ULPs to gain an advantage in the bargaining process. As the ALJ stated, one reason why Alwin was obligated to rescind its unilateral changes was "to enable the Union, when required to address these issues at the bargaining table, to negotiate their every aspect, including initial implementation. It was not intended that the Union be reduced, as here, to picking over the detail of accomplished facts only to the extent permitted by [Alwin]...." *Alwin II,* slip op. at 44.

There is ample evidence from which the Board could conclude that Alwin used the implementation of the production standards to move the baseline for negotiations.[7] Alwin consistently took the position that the production standards which had been implemented unilaterally in September 1993 had been "proven" and were not subject to negotiation or the grievance procedure. By contrast, Alwin proposed that if it wanted to establish a new production standard, that standard would be subject to grievance when first implemented, and that the union could take the issue to arbitration.[8] There is ample record evidence that the company treated the standards which were in place on February 28, 1994, not as proposals for new standards, but as established standards not subject to negotiation.[9]

Finally, the fact that the company made repeated efforts to settle the pending grievances concerning production standards as part of the negotiations is also evidence that the ULP made it harder for the parties to reach agreement. The company did not propose rescinding all disciplinary actions, including discharge, until February 28, 1994. If Alwin had any doubts about whether the unilateral implementation of production standards constituted a ULP, and wanted to encourage good-faith negotiations over those standards, a more appropriate path would have been to rescind disciplinary actions, and probably the production standards, at the beginning of negotiations.[10] *See Porta-King Bldg. Sys. v. NLRB,* 14 F.3d 1258, 1263 (8th Cir.1994) ("An employer's offer to bargain after unlawful, unilateral layoffs

**6.** It is worth noting that historically, prior to 1992, the union and Alwin had had a harmonious relationship.

**7.** We focus only on the production standards for convenience. The changes in vacation policy could serve to illustrate a similar point, if perhaps on a less critical issue in the negotiations. *But cf. Intermountain,* 984 F.2d at 1570 (unilateral change which is not a major subject of bargaining can still harm bargaining process so as to prevent a good faith impasse).

**8.** During negotiations, the union expressed concern about limiting the time to grieve standards, but did not reject the idea of arbitrating performance standards.

**9.** In August 1994, the company did propose allowing the union to challenge all production standards. At that point, however, the Board had issued its opinion in *Alwin I,* ordering Alwin to rescind the production standards. In light of Alwin's failure to indicate at that

session that it would take any steps to comply with the Board's order, it is hardly evidence of good-faith negotiation that it offered to let the union go to arbitration on those standards. *Cf. Alwin II,* slip op. at 5–6 (Member Brame, dissenting in part from Board's order, finding that Alwin engaged in "unusually aggravated misconduct" when it failed to alter materially its bargaining position after the *Alwin I* decision).

**10.** Rescinding the production standards for the period dating from December 1993 until February 1994 would not have prevented the parties from litigating a ULP charge based on the unilateral implementation of the standards in September 1992, although it could have affected the remedy to which the union would be entitled. *See Cauthorne,* 691 F.2d at 1026 (ongoing liability for ULP ends when parties reach agreement or good-faith impasse).

have occurred, and after an unfair labor practice charge has been filed, does not satisfy its duty to bargain in good faith"); cf. *Storer Communications, Inc.,* 297 N.L.R.B. 296, 298 (1989) (while a unilateral change does not necessarily preclude good-faith negotiations, "there are circumstances where the nature of an employer's unilateral change, unless rescinded, will preclude postimplementation good-faith bargaining").

Accordingly, we find the Board's conclusion that the parties' inability to reach an agreement was due in part to the existence of the unremedied ULPs to be supported by substantial evidence on the record. It follows that the parties did not reach a good-faith impasse and Alwin was not entitled to implement its final offer altering terms and conditions of employment. *See Litton,* 501 U.S. at 198, 111 S.Ct. 2215; *Intermountain,* 984 F.2d at 1570; *Cauthorne,* 691 F.2d at 1025.

▆▆▆ In addition to finding that the parties failed to reach a good-faith impasse, so that Alwin violated section 8(a)(5) when it unilaterally implemented its final offer, the Board also found that the employees' strike was an unfair labor practices strike, so that the company violated section 8(a)(1) by replacing the striking workers, and otherwise treating them as economic strikers. *See NLRB v. International Van Lines,* 409 U.S. 48, 50–51, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972) (economic strikers subject to permanent replacement; unfair labor strikers generally entitled to reinstatement). A strike is an unfair labor practice strike "if the employer's violations of the labor laws are a 'contributing cause' of the strike." *General Indus. Employees Union, Local 42 v. NLRB,* 951 F.2d 1308, 1311 (D.C.Cir.1991).[11]

The Board concluded that the decision to strike was motivated, at least in part, by Alwin's "insistence to impasse on its final offer, which included the two employment terms found to be unlawfully implemented in *Alwin I.*" *Alwin II,* slip op. at 1. The Board also concluded that Alwin's unlawful behavior prolonged the strike.

Alwin contends that the terms of its last offer, which were implemented after the impasse, were significantly different from the employment terms which were unilaterally implemented two years earlier. Alwin views the strike as a rejection of the proposed concessionary contract, and argues there is not substantial evidence to support a finding that the strike was motivated in part by the prior unilateral implementation of the production standards.

Alwin's argument appears to be premised largely on the idea that, because the company had made some concessions on contract language concerning production standards, the employment term implemented on March 1, 1994, as part of Alwin's final offer, was not the same employment term that existed on February 28, 1994, as an unfair labor practice. The reality is that the *substance* of the performance standards did not change on March 1, 1994.[12] Thus, as long as there is substantial evidence that Alwin's continued use of production standards, and discipline issued pursuant to them, contributed to the decision to strike, the Board was correct in characterizing the strike as an unfair labor practices strike.

There is substantial evidence in the record to support the Board's finding that the existence of the production standards in part motivated the union members' decision to strike. There is no doubt that the production standards, as they were in effect on February 28, 1994, were one of the core issues in the negotiations. Before the

---

**11.** An economic strike can also be converted to an unfair labor practice strike if the strike is prolonged by the employer's later, unlawful conduct. *General Indus. Employees Union, Local 42,* 951 F.2d at 1311.

**12.** There was testimony that the most controversial performance standard, for the drive roller job, did not change from when it was unilaterally implemented in 1992 until at least December 1994.

union voted to reject the company's offer and go on strike, the union's chief negotiator specifically pointed out that accepting the offer meant that the union could not challenge any of the production standards which had been implemented prior to March 1, 1994, and which had already caused seven employees to lose their jobs. Giving up any possibility of changing those standards was a major issue for the employees. *See* J.A. at 442–43 (testimony that inability to challenge standards was important because workers "were scared to death because they didn't know if they were going to be the next one on the chopping block"). In addition, a striking worker told a local newspaper that one of the reasons for the strike was the fact that Alwin was discharging workers for failing to meet performance standards. This evidence is sufficient to support the Board's finding that the unilateral implementation of the production standards was one of the motivating factors for the strike.

Alwin also objects to the Board's finding that the company violated the Act in its treatment of striking workers Sheldon Anderson and John Tilly, by not giving them their former positions back immediately when they made an unconditional offer to return, and by putting them on one of the most difficult jobs and then disciplining them for failing to meet the performance standards. Alwin's objections to this finding are largely dependent on its contentions that the impasse was valid and the strike was economic.

Given our conclusion that it was a ULP to maintain the performance standards after March 1, 1994, Alwin must concede that the Board properly required it to rescind the discipline issued under the performance standards. *See, e.g., NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 346–47, 73 S.Ct. 287, 97 L.Ed. 377 (1953); *Cauthorne*, 691 F.2d at 1025. Likewise, given our conclusion that the Board was justified in finding that the strike was motivated in part by the unfair labor practices, Alwin must concede that Anderson

and Tilly were entitled to return to their former positions when they asked to do so, and not when Alwin had need of them. *See International Van Lines*, 409 U.S. at 50–51, 93 S.Ct. 74; *General Indus. Employees Union, Local 42 v. NLRB*, 951 F.2d at 1311. Although the issue is somewhat cumulative, we also note that there is substantial evidence in the record as a whole to support the Board's finding that Alwin's treatment of Anderson and Tilly was due in part to their participation in the strike.

We uphold the Board's other findings either because Alwin did not challenge them, *see International Union of Petroleum & Indus. Workers v. NLRB*, 980 F.2d 774, 778 n. 1 (D.C.Cir.1992), or because Alwin only challenged them on the ground that they were dependent on a finding that the strike was an unfair labor practices strike. Accordingly, we conclude that all of the Board's findings are supported by substantial evidence in the record.

### B. *Alwin's Objection to the Remedy*

The Board endorsed the ALJ's finding that Alwin had engaged in "egregious" conduct, and adopted the ALJ's proposed remedy requiring Alwin to reimburse the union for the costs and expenses the union incurred in negotiating the new CBA, in undertaking the strike, and in litigating *Alwin II* before the Board. The Board likewise required Alwin to reimburse the General Counsel for his costs of litigating this matter. In this court, Alwin contends that the remedy is not justified and is beyond the Board's authority.

The Board noted in its decision that Alwin had not excepted to the remedy, and thus would be barred from seeking review of it in a court of appeals. Nonetheless, the Board discussed its rationale for the remedy and its authority for ordering it. The Board cited the ALJ's. finding that Alwin's conduct frustrated the bargaining process and depleted the Union's resources, so that extraordinary remedies to restore the *status quo ante* were warrant-

ed. The Board also found that Alwin's bad faith in negotiations, by insisting on its terms even after they were found to be unlawful in *Alwin I*, and in litigating *Alwin II*, justified an award of litigation costs to the union and the General Counsel. In ordering these remedies, the Board relied on section 10(c) of the Act and its inherent authority to control its own proceedings.

Member Brame dissented from this portion of the Board's decision, suggesting that an award of strike costs was unprecedented and insufficiently justified, and that Alwin did not engage in "unusually aggravated misconduct" until the Board decided *Alwin I* and the company still refused to change its negotiating position significantly. Thus, Member Brame indicated he would only award the union its costs for the August 1994 negotiating session.

█ Section 10(e) of the Act requires the Board to seek enforcement of its order in a court of appeals, but provides that "no objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see also* 29 C.F.R § 102.46 (1998) (specifying how to except properly to an ALJ decision). The Supreme Court has indicated that section 10(e) bars review of any issue not presented to the Board, even where the Board has discussed and decided the issue. A court of appeals altogether "lacks jurisdiction to review objections that were not urged before the Board." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) (where Board

raises issue *sua sponte*, aggrieved party must seek reconsideration by Board before seeking judicial review); *International Ladies' Garment Workers' Union v. Quality Mfg. Co.*, 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975) (same); *see also Local 900, IUE v. NLRB*, 727 F.2d 1184, 1191 (D.C.Cir.1984) ("[T]he statute requires objection to the Board, and not discussion by the Board, before an issue may be presented in court.").

█ We find no extraordinary circumstances present here, so the question is whether Alwin properly presented its objection to the remedy to the Board.[13] Our cases suggest that the critical question in satisfying section 10(e) is whether the Board received adequate notice of the basis for the objection. *See Parsippany Hotel Management Co. v. NLRB*, 99 F.3d 413, 417 (D.C.Cir.1996) (ground for exception must be evident if not explicit); *Consolidated Freightways v. NLRB*, 669 F.2d 790, 793 (D.C.Cir.1981) ("Cases interpreting section 10(e) look to whether a party's exceptions are sufficiently specific to apprise the Board that an issue might be pursued on appeal.").

Alwin's exceptions to the decision and order of the ALJ do not mention the remedy proposed by the ALJ. In the introduction to its brief in support of exceptions, Alwin included the following language:

> Despite the weight of record evidence to the contrary and applicable law inconsistent with the ALJ's Decision, the Judge incorrectly concluded that Respondent violated Sections 8(a)(1), (3), (4) and (5) of the Act. As a result, the Judge proposed extraordinary and unduly burden-

13. We could review the remedy if we believed it was "patently in excess of [the Board's] authority." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311 n. 10, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979); *see also NLRB v. Cheney California Lumber Co.*, 327 U.S. 385, 388, 66 S.Ct. 553, 90 L.Ed. 739 (1946); *Local 900, IUE*, 727 F.2d at 1191 n. 5. Without deciding whether the Board has authority to award strike-related costs under section 10(c) and litigation costs under its inherent authority,

we do not find this order to be obviously *ultra vires*. *See Unbelievable, Inc. v. NLRB*, 118 F.3d 795, 799 (D.C.Cir.1997) (Board has authority to order compensation for negotiation expenses if traditional remedies not sufficient to eliminate effects of aggravated misconduct); *id.* at 800 n. * (declining to decide whether Board has inherent authority to order payment of litigation expenses under "bad faith" exception to the American Rule).

some remedies against Respondent. It is from these findings and conclusions that Respondent excepts, offering the instant Brief in Support.

J. A. at 38. In the remaining 48 pages of the brief, Alwin does not mention the remedy.

This language clearly states that Alwin objects to the ALJ's allegedly incorrect "findings and conclusions." However, it would be a strain to read that sentence as stating a separate objection to the remedy, in the event the Board agreed with the ALJ that Alwin violated the Act. More importantly, even if a separate objection to the remedy could be located in that language, the language does not provide any hint as to the *basis* for Alwin's objection to the remedy.

 Where a party explicitly excepts to a remedy, and offers some explanation for its objection in its brief, we have held that there is sufficient notice to the Board to satisfy section 10(e). *See Capital Cleaning Contractors, Inc. v. NLRB,* 147 F.3d 999, 1009 (D.C.Cir.1998). We have also held that an exception to an issue can be sufficient to preserve an issue, even without briefing, if the exception sufficiently highlights the specific issue being contested. *See Davis Supermarkets, Inc. v. NLRB,* 2 F.3d 1162, 1174–75 (D.C.Cir. 1993). Where, however, a party excepts to the entire remedy, and provides no indication of the basis for its objection, the exception alone provides insufficient notice to the Board of the party's particular arguments to satisfy section 10(e). *See Quazite v. NLRB,* 87 F.3d 493, 497 (D.C.Cir.1996). It follows, *a fortiori,* that where a passing objection to the remedy is made in the introduction to a brief, and not in the exceptions, the Board has not received sufficient notice of the party's arguments to satisfy section 10(e).[14] Accordingly, we conclude that we lack jurisdiction to consider Alwin's objections to the Board's remedy.

**14.** We also note that the failure to except specifically to the remedy constitutes waiver of the issue under the Board's regulations.

### III. CONCLUSION

We conclude that the Board properly considered the impact Alwin's unfair labor practices had on the negotiations over a new collective bargaining agreement, and there is sufficient evidence in the record as a whole to support the Board's findings and conclusions. We hold that under 29 U.S.C. § 160(e) we lack jurisdiction to hear Alwin's objection to the Board's remedy. Accordingly, we deny Alwin's petition for review and grant the Board's cross-application for enforcement of its order.

*So ordered.*