# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 11, 2015     Decided November 13, 2015

No. 12-1034

SPURLINO MATERIALS, LLC AND
SPURLINO MATERIALS OF INDIANAPOLIS, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

COAL, ICE, BUILDING MATERIAL, SUPPLY DRIVERS, RIGGERS,
HEAVY HAULERS, WAREHOUSEMEN AND HELPERS, LOCAL
UNION NO. 716,
INTERVENOR

———

Consolidated with 12-1123

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*A. Jack Finklea* argued the cause for petitioner. With him on the briefs was *James H. Hanson*. *Timothy W. Wiseman* entered an appearance.

*Greg P. Lauro*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Julie B. Broido*, Supervisory Attorney.

*Neil E. Gath* was on the brief for intervenor Coal, Ice, Building Material, Supply Drivers, Riggers, Heavy Haulers, Warehousemen and Helpers, Local Union No. 716 in support of respondent. *William R. Groth* entered an appearance.

Before: GARLAND, *Chief Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: The petitioner's employees conducted a strike that they said was intended to protest the company's unlawful termination of and failure to reinstate a prominent union supporter. At the same time, they honored a clause in an agreement they had with the company not to strike -- for any reason -- on one particular construction project. The National Labor Relations Board (NLRB) found that the strike was indeed aimed at unfair labor practices, and that the employees were entitled to reinstatement when they offered to return to work. It further found that the employees' decision to respect the specific no-strike clause did not convert the strike into an unprotected partial strike.

In light of these findings, the NLRB concluded that the company's refusal to reinstate the striking workers was itself an unfair labor practice, and it ordered the company to reinstate the employees and to make them whole. The company has filed a petition for review of the Board's decision and order, and the

Board has filed a cross-application for enforcement. We deny the company's petition and grant the Board's cross-application.

I

Spurlino Materials (SM) and Spurlino Materials of Indianapolis (SMI), collectively "Spurlino," supply and deliver concrete to construction sites. James Spurlino is the majority owner, president, and designated manager of both SM and SMI. Each has a principal office in Ohio. SM's operating facility is located in Middletown, Ohio. SMI operates in Indianapolis, Indiana -- about two hours away.

In January 2006, Coal, Ice, Building Material, Supply Drivers, Riggers, Heavy Haulers, Warehousemen and Helpers, Local Union No. 716, was certified as the exclusive bargaining representative of SMI's drivers and plant operators. Over the following years, the union and SMI met a number of times in an unsuccessful effort to negotiate a collective bargaining agreement. Their last negotiating session, at which they again failed to reach agreement, took place in August 2009.

During the relevant period, the only contract that covered terms and conditions of employment for the unit employees was a Project Labor Agreement (PLA) for a convention center expansion project in downtown Indianapolis. Both SMI and the union (among other employers and unions) were signatories. The PLA applied only to work performed on that project. Article 12 of the agreement contained a no-strike clause with respect to work on the convention center project.

During this period, the union also filed a series of unfair labor practice charges. Relevant here is the union's charge that SM violated section 8(a)(3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(3), by discharging one of the

union's most prominent supporters, Gary Stevenson, in February 2007. In December 2007, an Administrative Law Judge (ALJ) found that SM did unlawfully discharge Stevenson. In March 2009, a two-member National Labor Relations Board affirmed that finding and ordered SM to reinstate Stevenson with backpay. SM and the NLRB subsequently filed cross-applications for review and enforcement of the Board's decision and order in the United States Court of Appeals for the Seventh Circuit. In September 2009, at the direction of that court, the parties entered into settlement discussions. Those discussions failed and, in late March 2010, the parties began filing their appellate briefs.[1]

Around that time, employees began to call the union's president, Jim Cahill, asking about the status of both the Stevenson unfair labor practices litigation and the contract negotiations with SMI. In response, Cahill called a meeting to update the employees and take a vote on whether to engage in an unfair labor practice strike. At the May 13, 2010 meeting, the union's attorney, Geoffrey Lohman, gave an update on the status of the Seventh Circuit litigation, informed the employees of the recent unsuccessful attempt to settle the case, and predicted that it might be years before the litigation concluded.

---

[1] In June 2010, the Supreme Court held, in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), that a two-member Board lacked authority to issue decisions. In July 2010, the Seventh Circuit remanded the Stevenson case back to the Board in light of *New Process Steel*. The following month, a newly constituted three-member NLRB panel reaffirmed the two-member Board's decision and order. The case then went back to the Seventh Circuit, which upheld both the Board's determination that Stevenson had been unlawfully terminated and its order of reinstatement. *Spurlino Materials, LLC v. NLRB*, 645 F.3d 870, 882-83 (7th Cir. 2011).

Lohman also took questions. Some employees asked about the Stevenson litigation and said that they should do something to get the company to comply with the Board's reinstatement order. At least one employee asked a question related to the status of the contract negotiations, prompting Lohman to provide an update about those negotiations as well. When the conversation turned to a strike, Lohman explained the difference between an unfair labor practice strike and an economic strike, advising the employees that SMI would be required to reinstate them upon request if they engaged in the former, but not necessarily if they engaged in the latter. Accordingly, he said, the union recommended that, if there were to be a strike, it should be over the company's unfair labor practices. Following Lohman's presentation, the employees voted unanimously to engage in an unfair labor practice strike.

Wishing to make the strike as effective as possible, the union did not immediately call for the employees to strike. Ten weeks later, however, after learning that SMI would start a "big job" on August 3, Cahill decided that it was an opportune moment. *Spurlino Materials, LLC*, 357 NLRB No. 126, at 4 (Dec. 6, 2011) (ALJ Op.). On the morning of August 3, he had a strike letter delivered to SMI's operations supervisor/dispatcher. The letter stated that the employees would be engaging in an unfair labor practice strike that would continue "until Spurlino Materials remedie[d] the unfair labor practice it committed in discharging Gary Stevenson," including giving Stevenson "an offer of reinstatement . . . [and] lost wages." J.A. 599.

The letter further stated that the strike would "cover all work performed by the bargaining unit which is not subject to a labor agreement with a binding no strike clause." *Id.* In that regard, it said that the union would "continue to honor Article 12 of the Project Labor Agreement" for the convention center

project, *id*., which stated that the signatory unions would not engage in any "economic or unfair labor practice strike" on that project, PLA ¶ 12.1 (J.A. 567). Accordingly, the letter declared that unit employees assigned to that project would "fully perform all work covered by the PLA in accordance with that no strike provision" and would not picket at that jobsite. J.A. 599.

SMI was able to continue its operations throughout the course of the nine-day strike, using SM employees from Ohio and hiring approximately sixteen replacement workers to cover the striking employees' work. Despite the striking employees' willingness to perform PLA-related work, SMI did not assign them any such work. Throughout the strike, the employees picketed with signs stating that they were on an "unfair labor practice strike for the illegal termination of Gary Stevenson." *Spurlino Materials*, 357 NLRB No. 126, at 5.

On August 11, Cahill gave SMI's operations manager a letter notifying the company that the employees were prepared to end the strike and unconditionally return to work the next day. The letter demanded that the company immediately recall the employees to work. SMI, however, refused to reinstate the strikers. It told the union that it had no duty to do so, both because the strike was an economic strike (and SMI had hired permanent replacements for all positions), and because the strike was an unprotected partial strike since it had excluded the convention center site.

Thereafter, the union filed an unfair labor practice charge alleging that SMI, SM, or both as a single employer had violated sections 8(a)(3) and (1) of the NLRA, 29 U.S.C. §§ 158(a)(3) & (1), by refusing to reinstate the striking employees. Following a hearing, an ALJ concluded that SMI and SM constituted a single employer that had violated the Act as alleged. The ALJ ordered the companies to reinstate the employees and make

them whole for any loss of earnings and benefits suffered as a result of the unlawful refusal to reinstate them. The Board adopted the ALJ's findings and recommendations in all relevant respects.

Spurlino now petitions for review and the Board cross-applies for enforcement of its order. Spurlino defends its refusal to reinstate the striking employees on two grounds, which we take up in Part II. In Part III, we address Spurlino's further contention that the Board erred in finding that SMI and SM constituted a single employer. "We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Mohave Elec. Coop., Inc. v. NLRB*, 206 F.3d 1183, 1188 (D.C. Cir. 2000) (internal quotation marks omitted); *see* 29 U.S.C. § 160(e), (f).

II

Spurlino maintains that the Board erred in finding that its refusal to reinstate the striking employees was unlawful. It argues that the striking employees were not entitled to reinstatement because they engaged in: (a) an economic strike rather than an unfair labor practice strike; and (b) a partial strike. We consider these arguments below.

A

Strikes may be categorized as either economic or unfair labor practice strikes. *See Gen. Indus. Emps. Union, Local 42 v. NLRB*, 951 F.2d 1308, 1311 (D.C. Cir. 1991). That categorization carries significant consequences. Economic strikers run the risk of replacement if, during the strike, the

employer takes on permanent new hires. *NLRB v. Int'l Van Lines*, 409 U.S. 48, 50 (1972); *Gen. Indus. Emps. Union*, 951 F.2d at 1311. By contrast, employees who engage in an unfair labor practice strike are entitled to reinstatement to their former positions if they wish to return to work at the conclusion of the strike, even if the employer has hired replacements. *See Int'l Van Lines*, 409 U.S. at 50-51; *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278 (1956); *Gen. Indus. Emps. Union*, 951 F.2d at 1311. Accordingly, an employer violates the NLRA if it fails to reinstate unfair labor practice strikers once they have made an unconditional offer to return to work. *See Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 141-42 (D.C. Cir. 1999).

To determine into which category a strike falls, the Board looks to the employees' motivations for striking, considering both objective and subjective evidence. *See Gen. Indus. Emps. Union*, 951 F.2d at 1312; *Exec. Mgmt. Servs., Inc.*, 355 NLRB 185, 194-96 (2010); *Chi. Beef Co.*, 298 NLRB 1039, 1039 (1990). A strike wholly driven by the desire of employees to obtain favorable employment terms is an economic strike. When employees strike in protest of their employer's unfair labor practices, the strike is -- as the label suggests -- an unfair labor practice strike. *See Int'l Van Lines*, 409 U.S. at 50-51; *Gen. Indus. Emps. Union*, 951 F.2d at 1311.

In some cases, a strike will have more than one cause: employees will be spurred to action both by their desire to improve their negotiating position and by their desire to protest their employer's unfair labor practices. In such cases, the Board has employed a simple rule of categorization: so long as an unfair labor practice has "anything to do with causing" a strike, the strike is an unfair labor practice strike. *Gen. Drivers & Helpers Union, Local 662 v. NLRB*, 302 F.2d 908, 911 (D.C. Cir. 1962). "The employer's unfair labor practice need not be the sole or even the major cause or aggravating factor of the

strike; it need only be a contributing factor." *Teamsters Local Union No. 515 v. NLRB*, 906 F.2d 719, 723 (D.C. Cir. 1990) (internal quotation marks omitted); *see Alwin Mfg. Co.*, 192 F.3d at 141; *Gen. Indus. Emps. Union*, 951 F.2d at 1311.

Spurlino argues that its striking employees were not entitled to reinstatement because they engaged in an economic rather than unfair labor practice strike. Under the case law just described, Spurlino cannot win that argument as long as the employees struck at least in part to protest its unfair labor practices. Because the question of what motivated a strike is one of fact, we must uphold the Board's findings in this regard as long as they are supported by substantial evidence. *Gen. Indus. Emps. Union*, 951 F.2d at 1312; *see* 29 U.S.C. § 160(e), (f); *Monmouth Care Ctr. v. NLRB*, 672 F.3d 1085, 1089 (D.C. Cir. 2012).

We conclude that the Board's categorization of the strike as an unfair labor practice strike is supported by substantial evidence showing that at least part of the employees' motive to strike was Spurlino's unlawful refusal to reinstate Stevenson, who had been unlawfully discharged. The union called the strike-vote meeting for the specific purpose of taking a vote on whether to engage in an unfair labor practice strike. Following an explanation of the differences between an unfair labor practice strike and an economic strike, the employees unanimously voted to engage in an unfair labor practice strike. Consistent with that vote, the union's strike letter and the employees' picket signs specifically stated that the employees were striking to protest Spurlino's refusal to remedy Stevenson's unlawful discharge. Two striking employees who testified before the ALJ cited Spurlino's unwillingness to reinstate Stevenson as a reason they voted to strike. And at no time during the strike did the union make any economic demands. *See Spurlino Materials*, 357 NLRB No. 126, at 10.

Spurlino correctly notes that there was evidence that employees also had economic motivations for striking. In the spring of 2010, some employees voiced concerns and asked questions about the failed contract negotiations -- at the May 13 strike meeting, as well as at a mandatory employees meeting that the company called thereafter. But as this court has held, "[t]he employer's unfair labor practice need not be the sole or even the major cause or aggravating factor of the strike; it need only be a contributing factor." *Teamsters Local Union No. 515*, 906 F.2d at 723 (internal quotation marks omitted).

Spurlino mounts two principal challenges to the Board's determination that the strike was motivated by unfair labor practices. We find neither persuasive.

First, Spurlino argues that the Board's decision rests on "self-serving" evidence -- which, according to Spurlino, is evidence that supports the proponent's own interests and that is not verifiable because it goes to the proponent's subjective motivations. *See* Oral Arg. Recording 3:58-4:07. We do not know what to make of the first descriptor: it would be an act of unusual altruism for a proponent to put on evidence that did not support its interests. Surely Spurlino did not limit its witnesses to those who supported the union's case. Nor is the fact that some of the evidence went to the employees' subjective motivations surprising or disqualifying. After all, the core question is what the motivation was for the strike, and Board precedent clearly supports taking account of subjective evidence in making that determination. *See Gen. Indus. Emps. Union*, 951 F.2d at 1312; *Chi. Beef Co.*, 298 NLRB at 1039.

To be sure, Spurlino is correct that the credibility of "self-serving" evidence must be carefully assessed. But the Board and ALJ did that here. As Spurlino notes, there are indeed cases in which courts have rejected Board findings that strikes were

motivated by unfair labor practices -- findings supported by evidence that could be described as self-serving. But those courts neither excluded such evidence as irrelevant nor discounted its value to zero. Rather, they simply found that the evidence in those cases -- evidence that was less substantial or significantly less credible than the evidence upon which the Board relied here -- was insufficient to satisfy the substantial evidence test.[2]

Spurlino focuses particularly on the fact that the union's attorney explained to the employees the differences between an unfair labor practice strike and an economic strike before the employees voted to limit the strike to protesting Spurlino's treatment of Stevenson. But there is no legal requirement that, to be credited, a strike vote must be taken in ignorance of its consequences. *See Dorsey Trailers, Inc.*, 327 NLRB 835, 856 (1999) (affirming an ALJ's holding that a union could not "be blamed for having had sufficient foresight . . . to advise its members against walking out to protest something other than unfair labor practices"). The Board took into account the attorney's statements, as well as the other evidence described above -- including the fact that the strike letter and picket signs were limited to protesting Stevenson's termination, and the fact that the union never made any economic demands during the strike. These, together with the two employees' testimony about their own motivations, constitute substantial evidence to support

---

[2] *See, e.g.*, *Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 518-19 (4th Cir. 1998) (reversing the Board's determination where it relied exclusively on testimony about union officials' -- not union members' -- motivations); *Winn-Dixie Stores, Inc. v. NLRB*, 448 F.2d 8, 9-11, 10 n.4 (4th Cir. 1971) (finding the evidence insufficient where employee testimony that a strike was motivated by unfair labor practices was contradicted by picket signs and handbills that "reflected only economic grievances").

the Board's determination that Spurlino's unfair labor practices were a motive for the strike.

Second, Spurlino points to the three-year gap between the February 2007 discharge of Stevenson and the August 2010 strike as proof that the discharge could not have been a motive for the strike. Had the discharge actually been a motive, the company insists, the employees would have struck closer to the date of the discharge.

But this ignores the fact that the gap in time was a consequence of the employees' decision to first put their faith in the legal system -- rather than rely on self-help -- to rectify the unfair labor practice. In 2009, the NLRB did in fact order reinstatement, an order that the Seventh Circuit ultimately enforced. *See supra* note 1. But when the employees struck in August 2010, Stevenson still had not been reinstated. Spurlino was appealing the Board's determination to the Seventh Circuit, and the employees were told that settlement negotiations had recently failed. At that point, it was not simply Stevenson's discharge, but also Spurlino's ongoing failure to reinstate Stevenson, that the employees protested. *See Spurlino Materials*, 357 NLRB No. 126, at 14 (ALJ Op.) ("I conclude that the employees struck at least in part over the Respondent's unlawful discharge *and* failure to reinstate Stevenson." (emphasis added)); *see also* J.A. 599 (strike letter stating that the employees would strike "until Spurlino Materials remedie[d] the unfair labor practice it committed in discharging Gary Stevenson" and gave Stevenson "an offer of reinstatement" and "lost wages"); J.A. 116 (testimony by an employee that the "first goal of th[e] strike" was to "get Gary Stevenson his job back"); J.A. 126 (testimony by another employee that he voted to strike because "it was unfair that [Spurlino] w[as] not allowing [Stevenson] to come to work"). There was, therefore, no gap at

all between the continuing unfair labor practice and the day the employees began their strike.[3]

In sum, we conclude that substantial evidence supports the Board's determination that the strike by Spurlino's employees was an unfair labor practice strike.

B

Spurlino's second contention is that, even if the strike was an unfair labor practice strike, it was nonetheless outside the protection of the NLRA because the employees engaged in only a partial strike. As noted in Part I, the Project Labor Agreement contained a clause barring the employees from conducting any kind of strike -- including an unfair labor practice strike -- with respect to work on the convention center project. The union's strike letter informed Spurlino that the employees would "continue to honor" that clause, and so would cease all work except work on that project. *Spurlino Materials*, 357 NLRB No. 126, at 4. That exception, Spurlino maintains, rendered the strike an unprotected "partial strike."

A strike is protected under the NLRA only if it is a "complete" strike. *See Audubon Health Care Ctr.*, 268 NLRB 135, 137 (1983). Striking employees lose the protection of the Act if they engage in a "partial strike." *Inova Health Sys. v. NLRB*, 795 F.3d 68, 87 (D.C. Cir. 2015); *see First Nat'l Bank*,

---

[3] Spurlino further maintains that the union never requested that Stevenson be reinstated until its August 3 strike letter. That contention is baffling: the union filed a charge challenging Stevenson's termination in 2007, and it spent the intervening years litigating the lawfulness of that discharge and urging the remedy of reinstatement before both the NLRB and the Seventh Circuit. *See Spurlino Materials*, 357 NLRB No. 126, at 2-3.

171 NLRB 1145, 1151 (1968).  As the Board has explained, when employees "pick and choose the work they will do or when they will do it," their conduct "constitutes an attempt . . . to set their own terms and conditions of employment in defiance of their employer's authority to determine those matters." *Audubon*, 268 NLRB at 137.  Accordingly, employees who engage in a partial strike are not protected by the NLRA and may lawfully be discharged.  *Id*.

Spurlino argues that the employees' offer to perform work on the convention center project during the strike rendered the strike a partial strike.  It "makes no difference," Spurlino maintains, that the employees' willingness to continue working on that project arose out of the no-strike clause in the Project Labor Agreement.  Spurlino Br. 24.  Whatever the motivation, they stopped doing some -- but not all -- work and therefore were not entitled to reinstatement.  In reaching the contrary conclusion, Spurlino insists, the Board erred in applying established law to the facts of the case.

We disagree.  Like the Board, we find that the partial-strike precedents are a poor fit for the case before us.  *See Pacific Coast Supply, LLC v. NLRB*, 801 F.3d 321, 333 (D.C. Cir. 2015) ("We . . .  must give deference to [an agency's] interpretations of its own precedents." (internal quotation marks omitted)).  Spurlino correctly notes that the "purpose of prohibiting partial strikes is to avoid employees dictating the terms of their own employment."  Reply Br. 6; *see Highlands Hosp. Corp.*, 278 NLRB 1097, 1097 (1986) (declaring that to tolerate partial strikes "would be to allow employees to do what [the Board] would not allow any employer to do, that is to unilaterally determine conditions of employment" (internal quotation marks omitted)).  But Spurlino's employees were not attempting to dictate the terms of their employment or "to usurp [the employer's] prerogative to assign work," *Audubon*, 268 NLRB

at 137. "On the contrary," as the ALJ explained, they "were acting in accordance and compliance with the terms and conditions contained in the PLA, to which both the Company and the Union were signatory." *Spurlino Materials*, 357 NLRB No. 126, at 14.

Nor can it be said that the employees left Spurlino in doubt as to whether they were striking -- another concern that animates the partial-strike ban. *See Vencare Ancillary Servs., Inc. v. NLRB*, 352 F.3d 318, 324 (6th Cir. 2003) ("The underlying rationale of the prohibition on partial strikes is that the employer has a right to know whether or not his employees are striking."). The union's strike letter unambiguously declared that the employees were striking with respect to all work except work on the convention center project. Spurlino has never suggested any confusion about the employees' intentions in that regard.

The Board was also reasonable in buttressing its rejection of Spurlino's partial-strike argument by taking note of the "Catch-22" that Spurlino's position would create for the employees. *Spurlino Materials*, 357 NLRB No. 126, at 14. In Spurlino's view, if the employees honored the no-strike clause and agreed to perform PLA work, they would be engaging in a partial strike, thus forfeiting the NLRA's protection. Yet, if they refused to perform the PLA work, they would be violating the no-strike clause, which would again strip the strike of its protected status. *See NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 837 (1984). Hence, if Spurlino's position were accepted, the employees could be fired for engaging in any kind of strike. As the ALJ put it, "the employees would be forced to choose between forfeiting their right to strike or forfeiting their jobs." *Spurlino Materials*, 357 NLRB No. 126, at 14. Attributing such broad consequences to a no-strike clause limited to a single project would contravene not only the requirement that any waiver of the right to strike must be "clear and unmistakable,"

*Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983), but also "the strong interest of federal labor policy in the legitimate use of the strike," *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 235 (1963).

In sum, the Board was reasonable in concluding that the employees' respect for a prior contractual agreement did not convert their otherwise lawful strike into an unprotected partial strike.

III

Finally, Spurlino challenges the Board's determination that, although the unit employees were formally employed only by SMI, SMI and SM constituted a single employer. When the Board finds that two entities constitute a "single employer," the two entities may be held jointly and severally liable for any unfair labor practice committed by either one. *See Emsing's Supermarket, Inc.*, 284 NLRB 302, 302 (1987). The bottom-line question in considering whether two entities are a single employer is "whether they have failed to maintain the kind of arm's-length relationship that would normally characterize separate and independent companies." *Spurlino Materials*, 357 NLRB No. 126, at 6; *see Emsing's Supermarket*, 284 NLRB at 302.

To answer that question, the Board examines four factors: (1) common ownership or financial control, (2) common management, (3) interrelation of operations, and (4) centralized control of labor relations. *See S. Prairie Const. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 802 n.3 (1976); *RC Aluminum Indus., Inc. v. NLRB*, 326 F.3d 235, 239 (D.C. Cir. 2003). The Board has explained that "no single aspect is controlling, and all four factors need not be present to find single-employer status." *Bolivar-Tees, Inc.*, 349 NLRB

720, 720 (2007); *see RC Aluminum Indus.*, 326 F.3d at 239. As the question of single-employer status is "primarily factual," we again must uphold the Board's determination if it is supported by substantial evidence. *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 551 (3d Cir. 1983); *see Asher Candy, Inc. v. NLRB*, 258 F. App'x 334, 334 (D.C. Cir. 2007). We find no basis for disturbing the Board's well-supported determination that SMI and SM constituted a single employer.[4]

First, with respect to common ownership or financial control, the ALJ noted that James Spurlino was at all times the majority owner of both SMI and SM. Although Spurlino points out that there were no other common owners and that neither company had a board of directors, common ownership does not demand multiple common owners or a particular type of corporate structure. At the time of the ALJ's decision, James Spurlino owned 100% of SM and 52% of SMI, with the remaining 48% of the latter equally divided between his father and another company owned by a longtime friend. On these facts, the ALJ appropriately determined that there was "substantially common ownership and financial control." *Spurlino Materials*, 357 NLRB No. 126, at 6.

Second, as to common management, the ALJ noted that James Spurlino was the president and manager of both SMI and SM. He further found -- based on a detailed factual analysis -- that James Spurlino "makes the major decisions for both companies." *Id.* at 7 (discussing James Spurlino's role in, inter

---

[4] Spurlino contends that the Board's single-employer analysis is inapplicable to this case because there was no "precipitating event" or "overt act" by SM that would subject it to such analysis. Spurlino Br. 41. There is no precedent, however, that imposes such a triggering requirement for application of single-employer analysis.

alia, strategic direction and operations, property management, financial decisions, and major projects).

Spurlino attacks the relevance of the ALJ's findings, arguing that the common management inquiry should focus only on shared control of day-to-day operations -- not top-level decisionmaking. But the ALJ did not, as Spurlino maintains, ignore the fact that SMI had its own operations managers. *See Spurlino Materials*, 357 NLRB No. 126, at 6-7. Instead, the ALJ noted that under Board precedent "the absence of such common day-to-day management is not considered significant, particularly where, as here, the facilities are geographically separate." *Id.* at 7. Rather, "the relevant inquiry is whether there is 'overall control of critical matters at the policy level.'" *Id.* (quoting *Bolivar-Tees*, 349 NLRB at 721 n.4); *see Sakrete of N. Cal., Inc. v. NLRB*, 332 F.2d 902, 907 (9th Cir. 1964). Although common management of day-to-day decisions would support a finding of common management, *see Cimato Bros., Inc.*, 352 NLRB 797, 799 (2008), the ALJ's rejection of the inverse was well supported by the above-cited precedent. We therefore affirm the Board's determination that James Spurlino's managerial role at SMI and SM supported a single-employer determination.

Third, the ALJ found that SMI and SM satisfied the interrelation of operations factor. The two companies publicly held themselves out as the same enterprise -- "Spurlino Materials" -- on their common website, business cards, stationery, and trucks. At times, they did so internally as well. In addition, SM had admitted, in the Board proceeding involving the unfair labor practice charge for terminating Stevenson, that it was the employer of the unit employees. *Spurlino Materials*, 357 NLRB No. 126, at 7; *see also id.* at 1 n.1 (Board Op.) (noting that this was a "relevant consideration in determining the interrelation of operations between SM and SMI"). Further, the

ALJ catalogued a laundry list of specific evidence of interrelated operations: all invoices for SMI's purchases were sent to SM's facility; SM's controller did all of the accounting for SMI; there was a significant history of employee exchange between the companies; and employees for each company periodically did work for the other company. *Id.* at 7-8 (ALJ Op.).

The ALJ also found powerful evidence that "the companies' transactions between each other [were] not entirely at arm[']s length." *Spurlino Materials*, 357 NLRB No. 126, at 8. The companies did not invoice each other for shared costs of common services; they did not charge each other for all such services based on actual costs; SM frequently made large cash advances to SMI without any loan agreement, repayment terms, or interest; SM regularly paid SMI's bills directly; and large amounts of money frequently moved between the companies on the last day of the month, without invoices or other explanatory documentation. "Not entirely at arm's length" is an understatement.

Finally, with respect to common control of labor relations, the ALJ found that, although the companies had separate managers and dispatchers who exercised day-to-day control over employees, James Spurlino "ha[d] the ultimate authority over the labor relations of both" and "actually exercised that authority" by "determin[ing] the initial wages and benefits for the employees of both companies." *Spurlino Materials*, 357 NLRB No. 126, at 9. The ALJ further found that, although an SMI employee, Jeff Davidson, was the designated representative during collective-bargaining negotiations, Spurlino "personally met with the Union and its attorney and communicated directly with employees regarding the collective-bargaining negotiations." *Id.* Moreover, Davidson "made clear to the employees that Spurlino ha[d] the final say with respect to any agreement." *Id.* Ample evidence supported these findings and,

thus, the Board's conclusion that the labor relations of SM and SMI were centrally controlled.

As we have noted, Board precedent provides that "no single aspect is controlling, and all four factors need not be present to find single-employer status." *Bolivar-Tees*, 349 NLRB at 720. In this case, substantial evidence supports the Board's determination that all four were present. A fortiori, substantial evidence supports the Board's ultimate determination that SM and SMI were a single employer.

IV

For the foregoing reasons, we deny Spurlino's petition for review and grant the Board's cross-application for enforcement of its order.

*So ordered.*