**DETROIT TYPOGRAPHICAL UNION NO. 18, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Detroit News, Inc., et al., Intervenors.**

Nos. 98–1599, 99–1111, 99–1112, 99–1163 and 99–1180.

United States Court of Appeals, District of Columbia Circuit.

Argued May 4, 2000.

Decided July 7, 2000.

As Revised Aug. 18, 2000.

James B. Coppess argued the cause for the Union petitioners. With him on the briefs were Samuel C. McKnight, Duane F. Ice, John G. Adam, and Richard Rosenblatt.

Jeremy P. Sherman argued the cause for the Employer petitioners. With him on on the briefs were Joshua L. Ditelberg and Kristin A. Michaels.

Sharon I. Block, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Charles Donnelly, Supervisory Attorney. John D. Burgoyne, Deputy Associate General Counsel, entered an appearance.

James B. Coppess argued the cause for the Union intervenors. With him on the brief were Samuel C. McKnight, Duane F. Ice, John G. Adam, and Barbara Camens.

Jeremy P. Sherman, Joshua L. Ditelberg and Kristin A. Michaels filed the brief for the Employer intervenors.

Before: SILBERMAN and SENTELLE, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Two groups of petitioners challenge National Labor Relations Board orders arising out of a strike against the Detroit newspapers. The employers challenge those portions of the Board's orders determining that they committed unfair labor practices, *see Detroit Newspaper Agency,* 326 N.L.R.B. No. 64 (1998) (*Detroit I*), *on reconsideration,* 327 N.L.R.B. No. 146 (1999) (*Detroit III*), and that the strikers were unfair labor practice strikers, *see Detroit Newspaper Agency,* 326 N.L.R.B. No. 65 (1998) (*Detroit II*), while the unions object to the Board's determination that one employer's unilateral implementation of a change in work-assignment rules was lawful. The employers' petition for review is granted; the unions' is denied.

## I.

From July 1995 through February 1997, employees went on strike against Detroit's two major newspapers—petitioners The Detroit News, Inc. (the News) and The Detroit Free Press, Inc. (Free Press)—and a joint endeavor created by the papers under a partnership agreement signed in 1986, petitioner Detroit News Agency (DNA). Each paper is responsible for its news and editorial operations, but many other functions, such as circulation, marketing and some labor relations, are handled by DNA. The employees of these three companies are represented by 12 unions each representing a separate bargaining unit of the papers or DNA; petitioners are six of these unions which compose the Metropolitan Council of Newspaper Unions (the Council). Two of the unions in the Council are particularly important to this case: the Detroit Typographical Union No. 18 (DTU), representing composing room employees of DNA, and the Newspaper Guild of Detroit, representing editorial employees at the News.[1]

Each newspaper and DNA is responsible for its own labor negotiations. During bargaining in 1992, noneconomic issues were negotiated between DNA and each individual union, but economic issues were handled by DNA and the Council. *Detroit I*, 326 N.L.R.B. No. 64 at 34. When the 1992 agreements were about to expire (on April 30, 1995) and the parties began to discuss the next round of collective bargaining, DNA initially declined to accept the joint bargaining format, insisting instead on bargaining with each union separately. Agreements were eventually concluded with the skilled-trades unions, but negotiations on a unit basis with members of the Council ran past the 1992 agreements' expiration date, resulting in those agreements being extended day-by-day. *See id.* at 2, 34.

To expedite matters DNA tentatively agreed to engage in joint economic bargaining if progress could be made on noneconomic issues (the "two-stage bargaining agreement"). DNA continued to discuss economic issues with the individual unions, however, and as negotiations lagged DNA set June 30 as a deadline for their conclusion. (DNA frequently referred to its June 30 deadline in subsequent communications with the Council and its member unions.) The Council then requested that DNA formally agree in writing to two-stage bargaining; DNA declined to do so but again expressed its tentative agreement if individual negotiations over noneconomics could be finished by June 30. Negotiations between DNA and individual unions went past this deadline and were halted by the strike on July 13. *See id.* at 2.

The News initially provided the Guild with a list of proposals for its editorial employee unit including Proposal 7, "News Department employees who qualify as professionals within the meaning of Federal wage and hour laws may, at their option, apply annually to be salaried and exempt from overtime," Proposal 8, allowing the News to assign employees to radio and television projects, and Proposal 11, which stated "All future pay increases to bargaining unit employees will be on the basis of merit utilizing the Company's performance appraisal system." *See id.* at 60–61 (the "overtime exemption," "radio/tv," and "merit pay" proposals, respectively). The radio/tv proposal came with some baggage. In November 1994 the News implemented a similar proposal following a purported impasse with the Guild; an unfair labor practice charge was filed with the NLRB, which ruled in the union's favor on July 14, 1995. In the meantime, the News had introduced proposal 8.

At early bargaining sessions Guild negotiators expressed their opinion that the

---

1. The Guild also represents DNA's janitorial employees and the Free Press's editorial employees.

overtime exemption proposal was a subject upon which it was illegal to bargain and illegal to agree upon according to the Guild's legal advice, and until the News's unilateral implementation of this proposal on July 5 no counterproposal was ever made. *Id.* at 61. The Guild also stated with respect to merit pay that the performance appraisal system was a waste of time that it wanted to get rid of, and that it was concerned that merit pay decisions would be corrupted by race or gender discrimination. The News, on the other hand, was anxious to introduce merit pay and viewed it as a central issue. *See id.*

On April 25, the News provided the Guild with a more detailed merit pay proposal: unit members making the contract's minimum salary would receive at least a one percent salary increase, but a merit component would increase their pay by an average of four percent from the minimum. Salary increases for those making more than the minimum would be based solely on merit. At this meeting Guild negotiators asked numerous questions, but News negotiators admitted that specific details had yet to be considered. *See id.* at 62.

Two days later, the News faxed the Guild a new, more detailed proposal:

All employees of The Detroit News editorial department will receive a pay increase effective on the date of ratification of the new collective bargaining agreement. No pay increase will be less than one (1) percent. The average of all pay increases will be four (4) percent. Increases above one (1) percent will be based on the employees [sic] most recent evaluation unless the employee or his/her manager requests that another evaluation be done because the employee's performance has changed since the last evaluation. Irrespective of any delay caused by such re-evaluation, all raises will be retroactive to the date of ratification.

Raises for the second and third years of the contract will be handled under the above procedure and will be effective May 1, 1996 and May 1, 1997, respectively. The only change is that the minimum each year will be one (1) percent and the average will be three (3) percent.

Each year all contract minimums will increase by one (1) percent.

Employees of the union may grieve, but not arbitrate, the employee's evaluation or the timing or amount of the employee's pay increase.

News negotiators offered to meet to explain the proposal. The Guild negotiators claimed to understand it, although the ALJ found that they were uncertain whether the merit increases were to be based on the contractual minimum salaries or employees' actual salaries (typically higher). *See Detroit I,* 326 N.L.R.B. No. 64 at 63. At a meeting a week later, without inquiring into whether the new proposal was based on actual salaries or contract minimums, Guild negotiators reported that unit members were not at all interested in the merit proposal. The News rejected a Guild proposal of an across-the-board 15% pay increase. On several occasions after this meeting, the News characterized the Guild's treatment of the merit pay proposal that day as a rejection of the proposal. *See id.* at 62–63. At this meeting the Guild also reiterated its view that the overtime exemption proposal was illegal. *See id.* at 63.

In a flurry of letters at the end of May and beginning of June, the News informed the Guild that it thought negotiations over merit pay were deadlocked, and the Guild responded that it disagreed; when the News asked if the Guild were prepared to offer counterproposals, the Guild stated that it would be prepared to respond to all the issues on the table, and a meeting was scheduled for June 14. At this time the News also sought to set a firm deadline of June 30 for the completion of negotiations. *See id.*

At the June 14 session the News clarified for the Guild that merit payments would be based on actual salaries. The Guild's negotiator again rejected the News's suggestion that negotiations over merit pay were deadlocked, claiming to have come to the meeting to make counterproposals. However, although he asked questions about the News's proposal, no counterproposals were made, and he stated that the unit members were adamantly opposed to merit pay. *See id.* at 63–64. Negotiations over the overtime exemption proposal also went no further. The Guild again expressed its view that the proposal was illegal, though its negotiators asked questions about how exactly the proposal would work, and requested a list of employees eligible under the proposal. They also suggested that instead of the News determining whether individual employees qualified under the proposal, such determinations be made by the Department of Labor. The News replied that it did not have a list of employees and was unable to compile one because eligibility could only be determined at the time of each employee's application. In response to postimplementation information requests, however, it supplied the Guild with a list of categories of employees who might be eligible. The union's proposal that the Labor Department become involved in the application process was rejected as merely retaliatory. *See id.* at 63.

Following the June 14 meeting, the Guild on June 16 asked for negotiations to be delayed until some time in early July, after its national convention in Boston which would run from June 17 through June 24, with the Guild negotiators returning on June 26. The News's negotiator responded on June 20 by writing that he saw no reason to delay negotiations, and also wrote:

I understood prior to the last meeting that you intended to bargain on pay and overtime. However, you made no proposals on these key subjects and I have never received any indication that you intend to bargain over them. Unless you can assure me that you intend to modify your position on those issues, we will have no choice but to implement our last offer to you.

*Id.* at 64. No further meetings took place before the News's unilateral implementation of its proposals on July 5.

On June 28 the News released to its employees a memo providing details about the merit pay proposal, specifically that those employees who received an evaluation of "outstanding" or "commendable" would qualify, and some 90% of employees could expect to receive merit pay. The memo also accused the Guild of being unwilling to meet. On June 29 the Guild repeated its earlier request for a meeting, and stated a willingness to discuss overtime exemption. In response, at eight o'clock in the evening of June 30, a Friday, the News faxed the Guild an offer to negotiate the following Monday, July 3, at ten in the morning. The Guild's negotiators did not see this offer until late Monday afternoon, and when the News's negotiators met the Guild's earlier that day on an unrelated matter, the proposed meeting was not mentioned. *See id.* at 64–65.

Two days later, July 5, the News unilaterally implemented its proposals. In announcing implementation to employees the News stated that Guild negotiators had failed to appear at meetings and had refused to bargain. *See id.* at 65. At a postimplementation bargaining session on July 10 the Guild continued to ask questions about the proposals, making another request for a list of overtime-exemption eligible employees (a request repeated on August 4). It also asked that the overtime-exemption provision contain a clause specifying that employees working on an overtime basis would not be discriminated against on assignments, proposed a flat increase in salaries for all employees, and again raised the possibility of having the Labor Department issue "advisory opinions" on the eligibility of employees for salaried status. Over this and the follow-

ing day, the News answered some but not all of the Guild's questions about its proposals, and rejected all of the Guild's proposals.

The Council and its constituent unions began to plan a strike prior to the News's declaration of impasse. For instance, DNA's decision not to engage in joint bargaining, despite its tentative agreement to do so, was mentioned throughout June as a *causus belli*. Individual unions also held meetings in which they obtained strike authorization from their membership. *See id.* at 75. On July 6, following the News's declaration of impasse, the Council met and agreed to set a strike deadline of July 13. On July 12 the Council met once more and agreed to the following resolution:

> Whereas the DNA/Detroit Newspapers (including the News and Free Press) has engaged in anti-union conduct, negotiated in bad faith and reneged on its promise to bargain jointly on economics, the undersigned Unions hereby resolve their members employed at the DNA/Detroit Newspapers each will strike and honor each other's strike in protest of the DNA/Detroit Newspapers [sic] (including the News and Free Press) anti-union conduct and unfair labor practices.

*Id.* at 76. Testimony credited by the ALJ established that the unfair labor practices referred to in the resolution were the modification of DTU's jurisdiction (discussed next), implementation of the merit pay proposal, and the decision by DNA not to engage in joint bargaining. *See id.*

The next day the unions began a strike which would last until February 1997 when the unions made an unconditional offer to return to work. The employers, however, refused to discharge replacement workers to make room for the returning strikers, treating the strike as an economic strike. Instead, returning strikers were placed onto a preferential hiring list. *See Detroit II*, 326 N.L.R.B. No. 65 at 2–3.

\* \* \*

The unions' petition involves negotiations between DTU and DNA. Petitioner DTU's relationship with the newspapers and DNA is generally governed by collective bargaining agreements. In 1975, however, negotiations between the individual newspapers, on the one hand, and DTU on the other led to the parties entering into Memoranda of Agreement in addition to collective bargaining agreements; when DNA came into existence, it agreed to adopt the obligations those memoranda placed upon the newspapers. One Memorandum of Agreement guaranteed essentially lifetime employment to certain workers, and in exchange the unit was to be governed by a Section 10(a), entitled "work arrangements." In relevant part, Section 10(a) states "This section will describe the work arrangements of the [DTU] employee involving the use of scanners and VDT terminals when such equipment is performing composing room work *within the jurisdiction* of the Union." *See Detroit I*, 326 N.L.R.B. No. 64 at 47 (emphasis added). The section then goes on to describe under what circumstances only unit employees may use such equipment, and when non-unit employees may do so. *See id.* at 47–48.

The collective bargaining agreement between DNA and DTU for the 1992–1995 term, meanwhile, had sections titled "Jurisdiction," "Equipment Jurisdiction," and "Computer Jurisdiction," explaining, *inter alia*, that "all composing room work" was within the Union's jurisdiction. During negotiations over a successor bargaining agreement DNA proposed modifying these jurisdictional provisions by including in the new agreement language specifying that this jurisdiction would be non-exclusive: "Employees of other departments of [DNA] as well as employees of the Detroit News and Detroit Free Press may perform such work as is necessary." DTU, claiming that the ongoing Memorandum of Agreement—not the expiring collective bargaining agreement—defined its jurisdiction, considered DNA's proposal an attempt to modify an existing agreement,

and therefore only a permissive subject of bargaining. It refused to bargain, and on May 11 DNA declared impasse and implemented the proposal.

*     *     *

The unions filed unfair labor practice charges with the NLRB alleging that DNA and the newspapers had violated Sections 8(a)(5) and (1) of the National Labor Relations Act by breaching the two-stage bargaining agreement; by implementing the merit wage proposal and the radio/tv proposal; by abrogating DTU's jurisdiction; and by failing to provide a list of employees who would be eligible for overtime exemption.

The ALJ agreed with the unions on all but the DTU issue. The Board generally affirmed the ALJ's opinion; however, on the issue of the joint bargaining agreement it found that DNA had never clearly and unequivocally agreed to joint, two-stage bargaining, and therefore concluded it was not an unfair labor practice for DNA to insist on bargaining with individual unions. *See generally Detroit I*, 326 N.L.R.B. No. 64. The Board went on to observe, *sua sponte*, that while negotiating rules are only a permissive subject of bargaining and the Unions had struck in part to force agreement on such rules, "We do not suggest that the Union's insistence on adherence to the two-stage bargaining procedure was unlawful here." *See id.* at 5. The Board adopted the ALJ's reasoning with respect to merit pay, concluding that the News had bargained in bad faith, preventing a good-faith impasse on this proposal. It then reasoned that even if the News had bargained in good faith, its merit pay proposal was standardless, and therefore, under the Board's rule announced in *McClatchy Newspapers Inc.*, 321 N.L.R.B. 1386 (1996), *enforced*, 131 F.3d 1026 (D.C.Cir.1997) (*McClatchy II*), it could not be implemented even at impasse because it would be destructive of employees' collective bargaining rights.

An ALJ, meanwhile, had found that the employers unlawfully refused to rehire re-turning unfair labor practice strikers, relying on the earlier ALJ opinion as evidence of unfair labor practices. On the same day the underlying unfair labor practice findings were affirmed by the Board in *Detroit I*, it also affirmed the second ALJ opinion and ordered the rehiring of returning strikers. *See generally Detroit II*, 326 N.L.R.B. No. 65.

## II.

The employers challenge the unfair labor practice findings as well as the determination that the alleged unfair labor practices caused the strike. The thrust of their latter argument is that the unions struck not over the purported unfair labor practices, but to enforce the joint bargaining agreement. Indeed, they claim, the strike was unprotected because the unions unlawfully sought to force adherence to the joint bargaining agreement, a permissive subject of bargaining. Moreover, according to the employers, the Board's determination that the employers committed unfair labor practices is not supported by substantial evidence. The Board's examples of the News's bad faith were unsubstantiated or trivial, and the Board ignored the unions' refusal to bargain over key issues. They distinguish this case from *McClatchy* by emphasizing the details in the News's merit pay proposal not provided in the *McClatchy* proposal. DTU's petition claims that the News committed an unfair labor practice by making a unilateral midterm change to the ongoing Memorandum of Agreement.

### A. Lawfulness of the Strike

The employers' primary argument, which was the focus of the Board's reconsideration order, is that the strike was unprotected because it (unlawfully) sought to force DNA's adherence to the two-stage bargaining agreement, which was only a permissive subject of bargaining. As the Board explained in *Detroit III*,

There are certain situations in which the Board has found that a strike or other economic action in support of a proposal on a nonmandatory bargaining subject is unlawful.... These situations have involved ... a strike in furtherance of the unlawful condition that further bargaining depends on acquiescence to a demand on a nonmandatory subject.

327 N.L.R.B. No. 146 at 95; *see also United Food & Commercial Workers Int'l Union v. NLRB*, 880 F.2d 1422, 1428 (D.C.Cir.1989)("[C]ategorizing a matter a mandatory subject will ... authorize the union to use the economic weapons at its disposal to back up its demands at the negotiating table."). Two-stage bargaining, contend the employers, was the "paramount" reason for the strike. *See Detroit III*, 327 N.L.R.B. No. 164 at 95 ("[A]nalysis of the legality of conduct vis-a-vis a nonmandatory subject requires examination of the impact of such conduct on negotiations for mandatory subjects.")

■ We think the Board permissibly ruled, however, that the employers waived this argument by failing to raise it in a timely fashion before the ALJ. Though the employers' argument was presented in their exceptions from the ALJ's decision and motion for reconsideration, the Board in *Detroit III* determined it had been waived, as "[a] contention raised for the first time in exceptions to the Board is ordinarily untimely raised and, thus, deemed waived." 327 N.L.R.B. No. 146 at 1 (*quoting Yorkaire, Inc.*, 297 N.L.R.B. 401 (1989), *enforced* 922 F.2d 832 (3d Cir. 1990)). The employers do not generally challenge this procedural policy.

■ The employers do claim that the Board is, in effect, estopped from applying its policy because it decided *sua sponte* the lawfulness issue in *Detroit I*, by saying "We do not suggest that the Union's insistence on adherence to the two-stage bargaining procedure was unlawful here." 326 N.L.R.B. No. 64 at 5. That is an apparent mischaracterization of the Board's statement. The Board *did not actually decide* the lawfulness issue in *Detroit I*. Even if the Board had analyzed the issue more extensively, that still would not be sufficient to prevent the Board from applying its waiver policy. *Cf. Local 900 Int'l Union of Elec., Radio and Mach. Workers v. NLRB*, 727 F.2d 1184, 1191 (D.C.Cir.1984) (discussion of an issue by the NLRB did not necessarily prove compliance with § 10(e) of the NLRA requiring that issues be raised before the Board in order to obtain judicial review of such). Nor does the Board's resolution of the merits of the employers' argument on reconsideration in *Detroit III* undermine its position; the merits discussion was merely an alternative holding to its determination that the argument had been waived. *Cf. Burkhart v. WMATA*, 112 F.3d 1207, 1215 (D.C.Cir.1997) (district court's discussion of an alternative ground for its decision did not undercut its ruling that appellant's claim was untimely raised).[2]

### B. Merit Pay

We begin our discussion of this subject with the Board's determination that the News's implementation of its merit pay proposal runs afoul of *McClatchy* because we think that legal issue pervades the Board's analysis of the parties' merit pay negotiations. In *McClatchy* the Board confronted the implementation of an employer's merit pay proposal which would have set salaries strictly on the basis of "merit" as determined by the employer; no objective procedures or standards at all were proposed–there was nothing but a "discretionary cloud." *See McClatchy II*, 131 F.3d at 1032. Under such circumstances, we noted on review, the employer had essentially "de-collectivized" bargaining and prevented the union from knowing what it would be bargaining against in the future; we therefore held this justified a

---

2. The employer's counsel at oral argument came perilously close to insisting that it would have to prevail on this issue to win the case.

Board-created exemption to the general rule that employers may implement their last, best offer following impasse. *See id.* at 1032–33.

Although we had previously in *NLRB v. McClatchy Newspapers, Inc.,* 964 F.2d 1153 (D.C.Cir.1992) (*McClatchy I*), remanded for a fuller explanation of the contours of the Board's *McClatchy* doctrine, in *McClatchy II* we recognized the Board could legitimately proceed case-by-case to develop the boundaries of the doctrine. *See* 131 F.2d at 1035. That did not mean, however, that the Board could simply brandish *McClatchy*, without any real explanation, to prevent an employer from ever implementing a merit pay proposal after impasse. After all, as we recognized in *McClatchy I*, the Supreme Court has squarely held that merit pay is a mandatory subject of bargaining, *see McClatchy I,* 964 F.2d at 1162, *citing NLRB v. Katz,* 369 U.S. 736, 745, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), and if the Board is to treat it differently from other such subjects with respect to post-impasse implementation it must carefully justify its course.

■■ Instead, the Board treated this case as if it were on all fours with *McClatchy. See Detroit I,* 326 N.L.R.B. No. 64 at 7. We think that was quite unreasonable (arbitrary and capricious). *McClatchy* presented an unusual situation where an employer provided no details at all of its merit pay plan. Here, on the other hand, the News's proposal stated that raises would average four percent in the first year of the contract, and three percent in the second and third years. Merit pay determinations would be based on the annual employee evaluation process (the evaluation forms for which consumed over 100 pages in the joint appendix) and would be effective on fixed dates. Employees would also be permitted to contest the size of their raises using grievance procedures. To be sure, the employer's proposal carried a good deal of discretion. It did not foreclose the possibility that an employee would get a merit pay increase without achieving the top performance rating.[3] But any merit pay system inherently carries much employer discretion which, of course, is why unions resist them. In sum, we reject the Board's blithe extension of *McClatchy* to this case as unreasoned and unreasonable.[4]

■■ Purportedly without regard to *McClatchy*, the Board found that the News had bargained in bad faith regarding its merit pay proposal (and its overtime proposal discussed *infra*), and therefore it never reached a valid impasse justifying imposition of its overall proposal. This is a difficult question on review only because the Board's finding of bad faith negotiation is, like any question of fact (really a mixed question), entitled to a good deal of deference. *See NLRB v. Cauthorne,* 691 F.2d 1023, 1026 n. 5 (D.C.Cir.1982). We conclude, nevertheless, that the Board's finding cannot stand because it is infected with the legal error we have just discussed, and it is otherwise not supported by substantial evidence on the record as a whole.

The Guild was initially presented with the News's final merit pay proposal on April 27. The extant bargaining agreements expired on April 30, yet negotiations continued for an additional two months. The Guild made no counterproposals at the negotiation session on June 14, nor did it

---

3. The intervenor unions stressed at oral argument post-impasse statements by the News that various unspecified factors, such as the need to retain particular employees, could enter into merit pay determinations. *See, e.g., Detroit I,* 326 NLRB No. 64 at 68. This possibility was not foreclosed by the News's proposal—it was part of its retained discretion.

4. As in *McClatchy* the Board throws in the phrase drawn from *Great Dane* that implementing the merit pay proposal after impasse was "inherently destructive" of collective bargaining. *See NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). If that is meant to provide an alternative rationale for the holding it will not do.

send anything to the News in the three week interim between this meeting and the July 5 implementation,[5] although it had been told that June 30 was the News's bargaining deadline. With the exception of a proposal for an across-the-board pay increase made on May 3 the Guild does not appear to have done anything at these negotiation sessions but ask questions. The truth of the matter, which the record clearly reveals, is that the Guild's unit was unalterably opposed to the merit pay proposal from the outset and continuing up to the employer's implementation—not to the details but to the very concept. There was no evidence that the Guild was prepared to engage in real negotiations on the employer's proposals.

The Board found that the News had "repeatedly obfuscated and withheld details about its merit pay proposal, which details were relevant and necessary to the Guild's understanding of the proposal and to the formulation of a bargaining response." *Detroit I*, 326 N.L.R.B. No. 64 at 7. And the ALJ whose recommended findings the Board accepted determined that the Guild could not gain an understanding of the merit pay proposal's "cost, timing, criteria and procedures," and therefore could not "bargain intelligently" about the proposal. *See id.* at 71–72. But the essence of discretion—the News at one point characterized its merit pay determinations as "not rote," *see id.* at 66—implies that the employer will not be pinned down *ex ante* as to precisely how its discretion will be exercised. Management's decision to propose a discretionary merit pay system—and to insist on retaining legitimate bounds of discretion—cannot (except for the limited *McClatchy* exception) be treated differently than other mandatory subjects of bargaining; it cannot be "vetoed" by the Board. *See NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 487, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). The union's questions as to these criteria and procedures were obviously designed to narrow the zone of discretion the employer wished to preserve. That answers satisfactory to the union or the Board were not forthcoming is simply another way to say that the proposal carried insufficient details to pass the *McClatchy* test, and we have already rejected the Board's reasoning in that respect.

The Board fixed upon the News's failure to make clear early on that salary increases, under the merit plan, would be based on actual, not nominal, contract minimum salaries. This seems to us to be a wholly insignificant bit of evidence. Once the News had sent its final merit pay proposal to the Guild its negotiator offered to meet with his Guild counterpart to explain it. The Guild negotiator responded, however, that he already understood it. Similarly, when the negotiators met a week later no clarification was sought on this point. The problem, according to the Guild, was that the News did not "understand" the employees' dislike of the very concept. The Guild was informed that actual salaries would be used at the June 14 meeting, a full three weeks before impasse was declared. We cannot see how this sequence of events hints at the News's bad faith, nor how the Guild's not knowing this particular detail until three weeks before impasse hindered its ability to negotiate.

The Board also relied on the News's failure to provide the Guild with other crucial information and provision of such information directly to unit employees. It found the News "refused to provide the Guild with information as to how much money it proposed putting in the merit pay pool." *See Detroit I*, 326 N.L.R.B. No. 64 at 7. This is simply wrong; the News responded to the Guild's negotiator's June 14 inquiry by telling him to apply the 4% average raise to payroll information in the Guild's possession. The Board also thought a series of memoranda given unit employees immediately before and after implementation, which stated that merit increases would be given to those receiving

5. It should be noted that the Guild's convention occupied only one week of this period.

an evaluation of "outstanding" or "commendable," and that 80 to 90% of employees would or had received merit pay, was evidence of bad faith, because such information had not previously been furnished to the Guild. But the News's proposal stated that merit pay would be based on the evaluations, and the evaluation forms state "A[n employee] whose overall performance rating is outstanding or commendable is eligible for a merit increase." The Guild had copies of these forms, and knowledge of how unit employees had been rated.[6]

The Board also regarded the News's proposed scheduling of bargaining sessions on dates in June when it purportedly knew the Guild to be unavailable because of a convention as showing bad faith. We think that inference is unsupportable. The Guild on June 16 requested a delay in negotiations because of unstated "prior commitments." The News's negotiator responded "I cannot imagine what 'prior commitments' you have that are more important than these negotiations," and requested a meeting "for the next few days," which would be during the convention. *See Detroit I*, 326 N.L.R.B. No. 64 at 64. The ALJ found that the News must have known that the prior commitment was the convention because postings on a bulletin board at the News had announced it, and because a News memo sent the following week to employees criticized Guild negotiators for attending the convention instead of negotiating. *See id.* What the News knew a week later is not powerful evidence of what it knew a week earlier—it may have discovered, in response to its request for a meeting, that the Guild's negotiators were all out of town.[7] Even if the News's

negotiator had known that which the union negotiators were apparently unwilling to say—the latter wished to attend the convention—the worst interpretation that could be placed on the employer's gambit is that it was seeking to pressure the union negotiators to either admit the reasons for wanting a delay or to offer an early negotiating session.

As we noted after the convention the News, in response to a subsequent Guild request for a meeting, faxed a proposal on a Friday night for a meeting the following Monday morning—one day before a national holiday and two days before the declaration of impasse and unilateral implementation. The ALJ's opinion emphasizes this event as infecting the entire negotiating process: the News, according to the ALJ, essentially prevented the Guild from meeting to engage in negotiations which might have broken the deadlock that seemingly developed at the June 14 meeting, after which the Guild's negotiators signaled their desire to engage in further negotiations. Again, we think this inference is unsupportable. It is obvious that lawyers on both sides were maneuvering and the News was delivering the Guild a last clear chance. But convention or not, holiday or not, if the Guild really had wished to bargain on merit pay they had plenty of time to indicate that to the News. Asking questions was not enough. *Cf. Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 233 (D.C.Cir.1996) (concluding impasse was valid where "not a single one of the Union's statements ... actually committed the Union to a new position or contained any specific proposals").

**6.** The Board regarded the News's statements to employees claiming that the Guild had refused to negotiate as evidence of bad faith. *See Detroit I*, 326 N.L.R.B. No. 64 at 7. Neither its order nor the ALJ's recommendation explain why and the employer complains that the Board was improperly restricting its free speech. Before us the Board apparently abandoned that line of analysis and instead claimed that the employers were communicating to the employees that which it refused to tell the union. We simply do not understand this attempted transformation and therefore decline to pay any attention to this point.

**7.** Nor was there any evidence that the News's negotiator had actually seen the bulletin board posting.

■ The Board nevertheless asserts that the parties had not reached a good-faith impasse for another reason. The ALJ found that the unremedied unfair labor practice associated with the radio/tv proposal prevented the News from declaring impasse because it "*necessarily* tended to adversely affect the bargaining atmosphere and relationship between the parties," *see Detroit I*, 326 N.L.R.B. No. 64 at 72 (emphasis added), and the Board adopted this conclusion. *See id.* at 7 n. 17. Before us the Board apparently argues that only negotiations over the radio/tv proposal alone itself were affected, but that deadlock over this proposal was sufficient to prevent a good-faith impasse.

■ While it is sometimes true that unremedied unfair labor practices have this effect, *see, e.g., Alwin Mfg. Co. v. NLRB,* 192 F.3d 133 (D.C.Cir.1999), that is not *necessarily* the case. In *Cauthorne,* "we reject[ed] any presumption that an employer's unfair labor practice automatically precludes the possibility of meaningful negotiations and prevents the parties from reaching a good faith impasse." 691 F.2d at 1025; *see also Alwin Mfg.,* 192 F.3d at 137–38. The ALJ and the Board, by failing to rely on any evidence demonstrating how the unfair labor practice affected negotiations *in this case,* seem to have applied such a presumption. That is especially problematic here because the ALJ's account of negotiations suggests the radio/tv proposal was relatively unimportant compared to the merit pay and overtime exemption proposals; implementation of this proposal was not even mentioned by the ALJ in his discussion of strike causation. *See Detroit I,* 326 N.L.R.B. No. 64 at 77; *see also Teamsters Local Union No. 639 v. NLRB,* 924 F.2d 1078, 1083 (D.C.Cir.1991) (to determine whether there is a valid impasse the Board "considers a number of factors, including ... the importance of the issue or issues as to which there is disagreement"). We therefore conclude there is not substantial evidence to support the Board's determination that the unremedied unfair labor practice prevented the News from declaring impasse.

### C. Overtime Exemption

■ The Board's decision that the News committed an unfair labor practice by failing to respond to the Guild's overtime exemption information request rested on pure conjecture, and is therefore not supported by any—let alone substantial—evidence. Throughout negotiations the Guild repeatedly requested a list of employees eligible to take salaried status under the overtime exemption proposal. The News repeatedly responded that it could not compile such a list because it would not be able to determine eligibility until an employee actually applied. Instead, in response to post-implementation information requests it provided the Guild with a list of categories of employees who might be eligible.

Although it was never shown that a list of eligible employees existed—the General Counsel failed to subpoena the purported list, *see Detroit I,* 326 N.L.R.B. No. 64 at 28–29 (Members Brame and Hurtgen, dissenting in part)—the ALJ opined that "It is difficult to believe that the News entered negotiations without having formulated its own expectation of the scope and impact of its proposal...." *See id.* at 73. The Board agreed, noting that it shared

> the judge's doubts that [the News] would have made the proposal, and bargained so ardently for it, without some informed estimation of its effects. Even if the News did not possess a list of those employees whom it believed would qualify for exemption, the Guild was entitled to whatever information Respondent News did rely on.

*Id.* at 8.

Such speculation is not evidence. *See, e.g., Arizona Pub. Serv. Co. v. United States,* 742 F.2d 644, 649 n. 2 (D.C.Cir. 1984) ("[M]ere conjecture and abstract theorizing offered in a vacuum are inade-

quate to satisfy us that the agency has engaged in reasoned decisionmaking.").[8]

### D. The Unions' Petition

 We agree with the NLRB that DNA did not commit an unfair labor practice by unilaterally implementing a change in its collective bargaining agreement with petitioner DTU. The Memorandum of Agreement only describes working arrangements when equipment is "performing composing room work within the jurisdiction of the Union." That jurisdiction was defined not in the Memorandum of Agreement, but in the collective bargaining agreement. Since the collective bargaining agreement had expired DNA could propose a modification to DTU's jurisdiction, and since DTU refused to bargain over the proposal DNA could declare impasse and unilaterally implement it. This is exactly what happened, and it does not constitute an unfair labor practice.

### III.

The Board's discussion of strike causation was sparse, but the ALJ's opinion suggests the purported unfair labor practices which motivated the strike were DNA's decision not to engage in joint bargaining, its unilateral change of DTU's jurisdiction, and the News's unilateral implementation of merit pay and its failure to comply with information requests. *See Detroit I*, 326 N.L.R.B. No. 64 at 77; *see also Detroit III*, 327 N.L.R.B. No. 146 at 1. Having determined that the Board's conclusion that the News committed unfair labor practices is legally erroneous and unsupported by substantial evidence, we, of course, reverse its subsequent order holding the strikers to be unfair labor practice strikers. *See Alwin*, 192 F.3d at 141 (A strike is an unfair labor practice strike "if the employer's violations of the labor laws are a contributing cause of the strike.") (internal quotation marks and citation omitted).

\*     \*     \*

The employers' petition for review is granted; the union's petition for review is denied.

*So ordered.*

---

8. The News argues that even had it compiled a list of eligible employees, it was under no obligation to divulge it because the Guild persisted in labeling the overtime exemption proposal as illegal and refused to bargain over it. Because we do not think the Board had substantial evidence to support its finding that the News had a list of eligible employees, we need not reach this alternate argument.