# United States Court of Appeals
## For the First Circuit

No. 00-1631

THE EDWARD S. QUIRK COMPANY, INC.,
d/b/a QUIRK TIRE,

Petitioner/Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner,

and

TEAMSTERS LOCAL UNION 25,

Intervenor.

ON PETITION FOR REVIEW AND CROSS-APPLICATION OF AN ORDER OF

THE NATIONAL LABOR RELATIONS BOARD

Before

Boudin, Lynch and Lipez,

Circuit Judges.

Terence P. McCourt with whom Laurie J. Hurtt and Hanify &
King, P.C. were on brief for petitioner/cross-respondent.
Robert J. Englehart, National Labor Relations Board, with
whom Leonard R. Page, General Counsel, Aileen A. Armstrong,
Deputy Associate General Counsel, Howard E. Perlstein, Deputy
Assistant General Counsel, and Fred L. Cornnell, Supervisory
Attorney, were on brief for respondent/cross-petitioner.
Joseph A. DeTraglia with whom Matthew E. Dwyer and Dwyer &
Jenkins, P.C. were on brief for intervenor.

BOUDIN, Circuit Judge. On this appeal, the Edward S. Quirk Company ("Quirk") petitions for review of an order of the National Labor Relations Board (the "Board"). Quirk operates a tire warehouse and service center in Watertown, Massachusetts. In 1994, Quirk employed about 40 people, 15 to 20 of whom were members of Local 25 of the Teamsters (the "union"). When the existing contract expired in January 1994, the parties, with the aid of a federal mediator, held bargaining sessions over the next 18 months, but the union rejected Quirk's final offer for a new contract on May 18, 1995.

On June 1, 1995, concluding that the parties were at impasse, Quirk unilaterally implemented the health insurance and wage proposals included in its final contract offer. The wage plan at issue (there is no appeal as to wage proposals for retail workers and the health insurance plan) provided that Quirk's commercial employees would "be paid at a base rate of not less than $8.90 an hour, however, the Company may continue its current marketplace pay practices . . . ." During the previous contract term, Quirk had increased wages above contract

rates to stay competitive with other tire businesses in the area.

Thereafter, Quirk and the union clashed on a number of issues.  Starting in August 1995, the Board's general counsel filed several charges against Quirk, including claims that Quirk had committed unfair labor practices by unilaterally implementing its commercial wage plan (in June 1995) and by discharging Kenneith Jones, who had been acting as the union's shop steward (in March 1996).  These claims (and the other charges) were heard by an administrative law judge at a three-day hearing in December 1996.

On January 29, 1998, the ALJ found that Quirk had committed a number of violations, two of which are pertinent to this appeal.  First, it found that Quirk's implementation of the commercial wage plan violated section 8(a)(5) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(5) (1994), which makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."  Second, Jones's discharge was found to be a violation of section 8(a)(3) of the Act, id. § 158(a)(3), which prohibits an employer from discriminating against an employee in any "term or condition of employment to . . . discourage membership in any labor organization."

-3-

The Board summarily affirmed the ALJ's decision on these two issues as on most of the other charges. Edward S. Quirk Co., 330 N.L.R.B. No. 137 (2000), available at 2000 WL 309115, at *1. Quirk's petition for review contests the Board's action as to both the wage plan and the firing of Jones, but only the first of these claims warrants much discussion. The Board's orders are reviewable for mistakes of law, lack of substantial evidence to support factual findings, and arbitrary or capricious reasoning.[1]

We begin with the wage plan. Under the Act, an employer is required to bargain collectively on a range of issues, including wages, and it is ordinarily a violation of this duty for the employer to make unilateral changes. Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991). Nevertheless, where good-faith negotiations have led to an impasse, an employer can unilaterally implement its pre-impasse proposals, subject to qualifications. See American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622, 624 (D.C. Cir. 1968). The reason is that a union would otherwise be able to freeze an employer into an expired contract through a "unilateral veto" over adjustments. Colorado-Ute Elec. Ass'n v.

---

[1]See 29 U.S.C. § 160(e); NLRB v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 23 (1st Cir. 1999); Union Builders, Inc. v. NLRB, 68 F.3d 520, 522 (1st Cir. 1995).

NLRB, 939 F.2d 1392, 1404 (10th Cir. 1991), cert. denied, 504 U.S. 955 (1992).

Among the qualifications on this "right" of employers is the so-called McClatchy exception.[1]  In that case, the D.C. Circuit said that the Board could, even in the face of an impasse, refuse to allow the employer to adopt a new wage plan that effectively gave the employer carte blanche to pay almost anything it liked and to change wage rates thereafter at will. The Board said that an employer may not unilaterally implement wage proposals "that confer on an employer broad discretionary powers that necessarily entail recurring unilateral decisions regarding changes in the employees' rates of pay."  McClatchy II, 321 N.L.R.B. at 1388.

The reasons for this limitation, on the part of both the Board and the D.C. Circuit, are highly pragmatic.  The Board thinks that allowing a succession of unilateral changes by the employer, as opposed to an initial change, would make a union seem impotent to its members over time and further undermine the

---

[1]The exception ultimately adopted by the Board and upheld by the D.C. Circuit can be found in McClatchy Newspapers, Inc. v. NLRB, 321 N.L.R.B. 1386, 1390-92 (1996) ("McClatchy II"), enforced, 131 F.3d 1026 (D.C. Cir. 1997), cert. denied, 524 U.S. 937 (1998).  An earlier approach by the Board was disallowed. McClatchy Newspapers, 299 N.L.R.B. 1045, 1048 (1990) ("McClatchy I"), enf. denied, 964 F.2d 1153, 1154 (D.C. Cir. 1992).

union's bargaining ability by creating uncertainty about prevailing terms.

By contrast, permitting one set of unilateral changes per impasse lets the employer make an initial adjustment, but forces it to bargain again with the union if it wishes to make further adjustments down the road. See McClatchy II, 321 N.L.R.B. at 1391; see also Detroit Typographical Union No. 18 v. NLRB, 216 F.3d 109, 117 (D.C. Cir. 2000).

In this case, the Board agreed that an impasse had been reached in May 1995 when Quirk implemented its wage plan, but it viewed the wage plan as one that retained too much employer discretion to meet the McClatchy test. Quirk, 2000 WL 309115, at *1 & n.2. In response, Quirk first says that the Board is not entitled to impose the McClatchy qualification at all and that McClatchy is contrary to Supreme Court precedent; and second, it argues that even if McClatchy is sound, the proposal Quirk actually implemented is not so discretionary as to violate McClatchy and the Board was arbitrary and capricious in its contrary determination.

Quirk has not properly preserved the broader of the two objections. It did not squarely raise this broader claim before the Board, which means that it forfeited the objection unless adequately excused, see 29 U.S.C. § 160(e); Woelke & Romero

Framing, Inc. v. NLRB, 456 U.S. 645, 665 (1982). Quirk's claim that it did raise the issue with the Board is refuted by examining the brief it filed with the Board; and its alternative position--that the Board would have adhered to McClatchy anyway--is an excuse that has been roundly rejected by the Supreme Court, United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952); see also Sousa v. INS, 226 F.3d 28, 32 (1st Cir. 2000).[2]

Nevertheless, Quirk's attack on McClatchy is unimpressive. Nothing in the Act explicitly gives the employer the right to impose its last offer unilaterally at impasse. Arguably some inferences can be drawn from the statute's concept of what collective bargaining is about and the limits of Board power; but the "right" largely reflects a judgment by the Board and courts as to workable balance rather than anything very specific in the Act. See Laborer Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 543-44 n.5 (1988); McClatchy II, 131 F.3d at 1032 n.4.

Yes, the courts have said that the Board should promote bargaining and is not entitled to impose on the parties its own

---

[2]There is equally little merit to Quirk's contention that its statutory objection is a mere variation of an argument it made to the Board. See Joseph T. Ryerson & Son, Inc. v. NLRB, 216 F.3d 1146, 1151 (D.C. Cir. 2000).

substantive judgment as to terms.  NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 404 (1952); cf. 29 U.S.C. § 158(d).  But McClatchy  is designed to promote bargaining by requiring management to return to the table at some later stage.  Employer discretion in setting wages is fine if the parties agree:  it is the unilateral use of such a plan to impair further bargaining that concerns the Board.  McClatchy has been upheld by one circuit, McClatchy II, 131 F.3d at 1034-35, endorsed by another, Retlaw Broad. Co. v. NLRB, 172 F.3d 660, 668 (9th Cir. 1999), and rejected by none.

Quirk's claim that an employer has an unqualified right to make such unilateral changes rests on out-of-context quotations from Supreme Court decisions.  Neither of the two cases cited, American Nat'l Ins. Co., 343 U.S. at 404; Laborers Health & Welfare Trust Fund, 484 U.S. at 543-44 & n.5, rejected the Board's authority to impose reasonable restrictions on an employer's right to make unilateral changes in the face of impasse.  The Supreme Court itself has (in a different context) approved at least one limitation on unilateral changes after impasse, see Charles D. Bonanno Linen Serv., Inc. v. NLRB, 454 U.S. 404, 418-19 (1982) (no unilateral withdrawal from multi-employer bargaining).

Whether McClatchy applies in this case is a more troubling question. The commercial wage plan adopted by Quirk did not on its face reserve full discretion to Quirk to change pay rates. Quirk proposed to continue its "current marketplace pay practices" while promising employees that they would never be paid less than $8.90 per hour. It is not clear whether the Board is concerned with the "current marketplace pay" standard, or the $8.90 option, or something else.

The Board may think that the phrase "marketplace pay" is too vague and effectively reserves discretion to management to change wage rates at will, so long as they remain greater than $8.90. But if a contract for a commodity provided that a price would be "the current market price" for the good, this might well be a figure precise enough for a court or arbitrator to enforce. See Coca-Cola Bottling Co. v. Coca-Cola Co., 988 F.2d 386, 412-13 (3d Cir.), cert. denied, 510 U.S. 908 (1993); cf. Elkouri & Elkouri, How Arbitration Works, 1106-08 (Volz & Goggin eds., 5th ed. 1997). And, as to keeping the union abreast, a Teamsters local is likely to know very well what wage rates in a community are for the job or jobs in question.

Alternatively, the Board may have been concerned that even if marketplace pay was a sufficiently definite standard--or could be made so through the arbitration and grievance

-9-

procedure--Quirk was reserving too much discretion to itself by providing that it could choose between marketplace pay and $8.90 per hour. One would think that providing a floor would be a clear-cut benefit to employees and that in practice Quirk could hardly pay less than the marketplace wage. In all events, if the "may" is the Board's concern, Quirk is entitled to know this (it could eliminate the floor next time) and the reviewing court is entitled to know why the floor is excessive discretion.

The briefs filed by the Board and the union suggest yet other concerns. One is that the use of marketplace pay standards, even if the standards are precise, would provide disparate pay for workers who would normally be grouped in categories under a negotiated contract; another is that Quirk's proposal might somehow be read to reserve to it a third option-- neither marketplace pay nor a floor but an unrestricted right to pay whatever Quirk desired. If these were the concerns, they are not spelled out by the Board, and it is the Board's rationale that matters. See SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943).

The Board did not explain its reasoning but simply adopted the ALJ's position. See Quirk, 2000 WL 309115, at *1. The ALJ, in turn, summarily applied the McClatchy label to Quirk's wage plan, saying that the Board in McClatchy condemned

-10-

wage proposals "like the one here," adding that the new plan allowed changes "without any established criteria." Id. at *19-*20. But in McClatchy, the Board condemned a wage plan that allowed wages to be determined in a way that "kept most raises in McClatchy's complete discretion," McClatchy II, 131 F.3d at 1028, and the Quirk plan appears to contain more in the way of standards.

Quirk says that its freedom of choice under the wage plan is constrained because management's determinations remain subject to binding grievance and arbitration provisions. If this means that the marketplace wage for the job could be determined by a neutral third party, this would appear to be a significant limit on Quirk's discretion--one that was not present in McClatchy itself. See McClatchy I, 299 N.L.R.B. at 1048; see also Colorado-Ute, 939 F.2d at 1395. The ALJ and the Board are silent on this subject.

Quirk also contends that the Board now mechanically invokes the McClatchy exception without regard to the facts. Consonantly, the D.C. Circuit not long ago criticized the Board for "simply brandish[ing] McClatchy, without any real explanation . . . ." Detroit Typographical, 216 F.3d at 118. The Board counters that the same court recently upheld the Board's application of McClatchy in Anderson Enterprises, 329

-11-

N.L.R.B. No. 71 (1999), available at 1999 WL 883896, at *29-*33. But the employer there claimed an almost unlimited authority to vary wage rates and, by contrast to this case, the Board fully discussed the proposal.

McClatchy is based on employer discretion and discretion is a matter of degree, implicating policy judgments informed by Board expertise. However, Quirk's plan is at least narrower than that in McClatchy, and the Board owes the employer and a reviewing court something more of a reasoned explanation of where it draws the line and why the line has been crossed in this instance. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Detroit Typographical, 216 F.3d at 118. This would also give guidance to other employers facing similar problems in the future.

The other claim of error by Quirk is directed to the Board's ruling that Jones was fired because of his union activity. In concluding that this was so, the ALJ relied on evidence of anti- union activities by Quirk, Jones's union responsibilities, direct evidence of hostility to Jones because of his union activities, and the thinness of Quirk's avowed explanation for discharging Jones, namely, that his actions showed that he had decided to quit. Quirk, 2000 WL 309115, at *20-*31. Jones, whom the ALJ credited, said that he had been

-12-

told to go home and then was formally fired two days later.  Id. at *31.

The Board's findings were amply supported by substantial evidence, and the inference that Quirk fired Jones because of his union activities was legitimate.  Quirk's claim on appeal is that the firing was done by a new supervisor, one David Bradley, who allegedly did not know of Jones's union activities.  But Bradley consulted with Peter Quirk before telling Jones to go home and before sending him a termination letter, and the final call to Jones asking him to turn in his keys and uniforms was delivered  by another manager.  Under such circumstances, the Board was not required to believe Bradley's testimony that he alone made the decision.

For the reasons stated, the Board's order is vacated insofar as it pertains to the commercial wage plan and remanded for further proceedings consistent with this opinion; and the order is enforced so far as it concerns Jones's termination. Each party shall bear its own costs.

It is so ordered.