**LIQUOR INDUSTRY BARGAINING GROUP, et al., Petitioners**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent**

No. 01–1245.

United States Court of Appeals, District of Columbia Circuit.

Oct. 4, 2002.

Before EDWARDS, HENDERSON and ROGERS, Circuit Judges.

### JUDGMENT

PER CURIAM.

This cause was heard on the record from the National Labor Relations Board and on the briefs and arguments of counsel. For the reasons set out in the accompanying memorandum, it is

**ORDERED** that the petition for review be denied and that the cross-application for enforcement be granted.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R.App. P. 41(b); D.C.Cir. Rule 41.

### MEMORANDUM

The petitioners, the Liquor Industry Bargaining Group and individual members thereof[1] (Group), seek review of a decision of the National Labor Relations Board (NLRB or Board) that found the petitioners violated section 8(a)(5) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(5), by bargaining in bad faith with Local 19d of the Wine and Liquor Salesmen of New Jersey (Union)—specifically by making a final offer under which all employee compensation above a set mini-

---

1. The petitioning members are Fedway Associates, Royal Division of R & R Marketing, L.L.C. and The Jaydor Corporation.

mum was to be determined by each individual employer under an undefined compensation plan. We uphold the Board's finding of bad faith bargaining as supported by substantial evidence.

In August 1993 the Group and the Union began to negotiate the terms of a successor contract to the three-year contract set to expire on September 30, 1993. The Group's final offer to the Union, tendered on October 1, 1993, proposed that compensation be based, as in the past, on specific commission rates set according to the type of product sold and the type of purchaser. The Union unanimously rejected the offer and staged a strike from October 3–19, 1993. After the strike the sales representatives continued to work under the expired contract and the parties resumed negotiation in November 1993.

On March 24, 1994, at the last negotiating session, the Group submitted a final offer to the Union which differed significantly from both the expired contract and the October offer. This offer proposed no specific compensation plan but provided that "Sales Representatives shall be compensated in accordance with the wage and salary programs put into effect by the Employer" and that "[t]he Employer will provide the sales representative, prior to implementation and the Union upon request, with a written explanation of the wage and salary compensation program applicable to that sales representative." JA 103–04.[2] The offer further stipulated that "[n]otwithstanding any provision in this Agreement to the contrary, the terms of the written compensation program shall not be subject to the grievance and arbitration procedure," although "the issue of whether a sales representative was paid in accordance with the terms of the written

compensation program may be submitted to the grievance and arbitration procedure." JA 104. In addition, the offer eliminated several provisions in the old contract affecting employee compensation, including prohibitions against house accounts and supervisors engaging in sales or receiving commissions and a requirement that a reassigned account be replaced with a new one of "substantially equal volume." *Compare* JA 80, 86, 87 (final offer) *with* JA 101, 107, 108 (old contract).

On May 11, 1994 the Union unanimously rejected the final offer. In a letter dated May 13, 1994 the Group announced that "the March 24th offer w[ould] be implemented effective June 1, 1994." JA 122. The Union responded on May 17, 1994 asserting that, in order for the Union "to meet and intelligently discuss and evaluate" the Group's proposal, the Union "must be given certain very basic information—namely, it must know exactly what compensation is to be implemented for each and every unit salesperson as of June 1, 1994 by each Employer, and how such level of actual compensation has been determined for each unit employee." JA 126. In a letter dated May 23, 1994 the Group responded: "Prior to implementing any changes in the Sales Representatives' compensation structure pursuant to article 6 of the Employer's March 24, 1994 proposal, we will advise the Union as to the timing, criteria and procedures for determining and paying such compensation." JA 127.

On May 26, 1994 the Union filed an unfair labor practice charge against the Group and its employer members alleging they "refused to bargain collectively in

---

2. The offer did provide for minimum salaries. During the first year, each representative was guaranteed compensation equal to the lesser of $50,000 or 75% of his 1993 calendar year commissions. In subsequent years, each representative with three or more years of service was guaranteed compensation of $25,000 per year. JA 104.

good faith ... with regard to the compensation for the unit employees, by proposing direct dealings with the employees over each's compensation, by failing and refusing to supply the Union with information relevant to its performance as the bargaining agent, and by engaging in conduct designed to undermine the status of the Union as bargaining agent." JA 6. The NLRB Regional Director filed a complaint on December 5, 1995 alleging, *inter alia,* that the petitioners "failed and refused to bargain with the Union as to the timing, criteria, and procedures for compensation of employees in the Unit" by "insisting to impasse" on its March 24, 1994 wage proposal and thereby "sought total unilateral control over wages," JA 14.

Following a hearing, the ALJ issued a decision on April 15, 1997 in which he found, *inter alia,* that the petitioners had "failed and refused to bargain in good faith with the Union" in violation of section 8(a)(1) and (5) of the Act "by insisting to impasse on a wage proposal which, by its terms sought to retain unilateral control over all aspects of wages and compensation, by failing to bargain with the Union as to the timing, criteria and procedures for compensation of employees in the bar-

gaining unit described, and by its overall conduct." JA 70.

In a decision dated May 2, 2001 the Board upheld the finding of bad faith bargaining.[3] The Group filed a petition for review of the Board's decision on May 31, 2001. The Board cross-applied for enforcement on July 10, 2001.

"Under § 10(e) and (f) of the NLRA, 29 U.S.C. § 160(e), (f) (1994), this court will 'reverse the Board if, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence.'" *Associated Milk Producers, Inc. v. NLRB,* 193 F.3d 539, 542 (D.C.Cir.1999) (quoting *Micro Pacific Dev. Inc. v. NLRB,* 178 F.3d 1325, 1329 (D.C.Cir.1999)). "[T]he Board's finding of bad faith negotiation is, like any question of fact (really a mixed question), entitled to a good deal of deference." *Detroit Typographical Union No. 18 v. NLRB,* 216 F.3d 109, 118 (D.C.Cir.2000) (citing *NLRB v. Cauthorne,* 691 F.2d 1023, 1026 n. 5 (D.C.Cir.1982)). We defer to the Board's finding of bad faith bargaining because it is supported by substantial evidence.

The Board found that "the following factors establish that the Group entered into

---

**3.** The Board also denied the petitioners' motion to reopen the record to introduce a March 31, 1997 collective bargaining agreement between the individual employers and the Union, the terms of which are allegedly substantially the same as those in the March 24, 1994 final offer, and the results of a May 11, 2000 election decertifying the Union as collective bargaining agent of Fedway's employees. The Board denied the motion "as it seeks to adduce evidence of events occurring after the close of the hearing. See *Modern Drop Forge Co.v. Security League Union,* 326 NLRB 1335 fn. 1, 1990 WL 181413 (1998); *WXRK,* 300 NLRB 633 fn. 1, 1990 WL 181413 (1990); *Contemporary Guidance Services,* 291 NLRB 50 fn. 2, 1988 WL 214155 (1988)" and because "such evidence does not compel a different result in the instant case. That the

Union accepted the agreement the Respondents seek to introduce, or that Fedway employees have chosen to decertify the Union, has no bearing on whether their course of conduct in the instant case constitutes bad-faith bargaining." JA 44 n. 1. We review denial of such a motion for abuse of discretion and "will not find an abuse of discretion unless it 'clearly appear[s] that the new evidence would compel or persuade to a contrary result.'" *Reno Hilton Resorts v. NLRB,* 196 F.3d 1275,1285 n. 10 (D.C.Cir.1999) (quoting *Cooley v. FERC,* 843 F.2d 1464, 1473 (D.C.Cir.1988); alteration original). Evidence of bargaining in 1997 and decertification in 2000 is not so probative of the parties' willingness to negotiate in 1993–94 as to satisfy this standard.

bargaining with no real intent to reach a collective-bargaining agreement":

(1) the final offer "vested in its member-employers exclusive control over the critical subject of wages and eliminated entirely the Union's role in negotiating wages for unit employees";

(2) it "foreclosed any possibility that a unit member could contest either the means by which wages were set, or the actual wages themselves, because it removed the subject of wages from the contract's grievance and arbitration procedures altogether and barred strikes over all subjects";

(3) by authorizing supervisors' sales and house accounts it "had the effect of granting the employers unrestrained license to transfer sales accounts away from unit employees and effectively dissipate unit work";

(4) it deleted the "substantially equal volume" account replacement requirement in section 10.2 of the expired contract "permitting unilateral reduction of employee compensation without restriction"; and

(5) "Despite repeated requests from the Union for information and explanation about how the wage proposal would work, the Group stubbornly refused to offer any details, saying only that it needed 'flexibility' in its operations."

JA 45–46. We conclude that the Board, "[t]aking these factors together," reasonably and consistently with its precedent, inferred from them that "the Group's final offer was extreme in nature, was made without any corresponding incentives to secure the Union's assent, and evidences that the Group was not negotiating in good faith with a view to trying to reach or complete agreement with the Union." JA 46. *See Hydrotherm, Inc.*, 302 N.L.R.B.

990, 993–94 (1991); *Sparks Nugget, Inc. v. Hotel Local 86*, 298 N.L.R.B. 524, 527 (1990), *enforced in relevant part, Sparks Nugget, Inc. v. NLRB*, 968 F.2d 991 (9th Cir.1992).

The petitioners contend that our opinion in *Detroit Typographical Union No. 18 v. NLRB*, 216 F.3d 109 (D.C.Cir.2000), "compels an outcome contrary to that reached here." Petitioners' Br. at 37. We disagree. In *Detroit Typographical* the court rejected the Board's finding of bad faith bargaining based on the employer's insistence on a discretionary merit-pay proposal. Unlike the undisclosed pay systems contemplated by the Group here, the proposed plan in *Detroit Typographical* was described to the union during negotiations. *See Detroit Typographical*, 216 F.3d at 113. In addition, the union negotiators there acknowledged they understood the proposed plan; moreover, management offered to meet with them to further clarify its terms. *Id.* at 119. Here, by contrast, despite the Union's repeated requests, the Group furnished no information outlining the substance of the future compensation plans and thereby left the Union no basis for negotiation. Under these circumstances the Board could reasonably conclude the Group was bargaining in bad faith with no real intent to reach agreement on compensation.[4]

---

**4.** We find the petitioners' other challenges to the Board's order are without merit and therefore warrant no discussion. Because we deny the petition for review, we do not reach the Board's alternative ground for enforcing its order.